MARY B. CARROLL, Plaintiff-Appellant, *v.* JOSEPH A. CARROLL, Defendant-Appellee.

First District (3rd Division)   No. 77-1297

Opinion filed September 13, 1978.—Rehearing denied October 13, 1978.

Phillip E. Couri and Robert J. Ryan, both of Chicago, for appellant.

Leonard T. Timpone and Frank Pellegrini, both of Chicago, for appellee.

James T. Friedman, of Chicago, guardian ad litem.

Mr. PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

The circuit court of Cook County granted the plaintiff, Mary B. Carroll, a divorce from the defendant, Joseph A. Carroll. The court awarded the custody of the couple's five minor children to their father and ordered the division and distribution of the marital property. This appeal by Mary Carroll contests the custody and property awards.

The complaint for divorce was filed in August, 1975. Later that same month the parties agreed to the entry of an order giving temporary custody of the Carroll children to their mother; another order stipulated that Joseph pay temporary alimony and child support. A guardian *ad litem* was appointed for the children. In January 1977, using a bifurcated procedure, the court first considered the divorce. Although the judge stated in January that the judgment for divorce was granted to Mary, the actual order of divorce on the grounds of desertion, was not entered until October 1977.

A second proceeding, started on the same day in January, was limited to evidence concerning both parties' request for custody of the children. After several days of testimony, the trial judge found that neither side had shown the other to be an unsuitable or unfit person to have care and custody of the children and on January 13, 1977, the court told the parties they were to have joint custody of the children. The trial judge did not remove the children from the physical custody of their mother. The judge stated:

> "What I intend to do in this case is to grant joint custody of these children. And I am going to work out the terms of that joint custody. I have not worked that out yet. It appears to me with the oldest child being ten and the youngest child being approximately

five and of the five children, four being girls, that these children certainly need the love and affection that a mother would give. * * *"

The matter was continued several times. In April 1977, Mary filed a petition based upon Joseph's failure to make child support payments. At that time, Joseph filed a counterpetition. He requested that the physical custody of the children be changed, charging that Mary was unfit to have custody. The petition alleged she "carried on a relationship with an unmarried male" in her home in view of the children, that "the gentleman daily visits her, leaving in the wee hours of the morning, and that [the] situation is detrimental to the children." No evidence was considered on the petitions. In May 1977, Mary submitted a proposed financial settlement. In July on a separate motion the court granted their father summer visitation with the children.

It was not until August 1977 that the court conducted a hearing to consider both Joseph's petition for a change of physical custody and the financial aspects of the case. Most of the evidence adduced at this August hearing related to the financial status of the family, dealing with the amount of marital debt and the extent of the marital assets. Both parties testified in detail to their living expenses.

Joseph, a high school teacher, said that if the court granted custody of the children to him he would change his residence from an apartment to a house. He proposed that the family home in Glencoe, Illinois, be sold to pay off the marital debt. During cross-examination he was asked about an alleged suicide attempt he made prior to January 1977. The court sustained an objection to that question, saying that the issue of custody had been determined and it was only the issue of fitness for physical custody that was being litigated that day. The court limited Mary's questioning of him to occurrences subsequent to the January 1977 ruling.

Mary testified that she was employed at hourly wages and worked 40 hours per week. She presented a plan which she said would alleviate the financial stress on the family. She explained that a friend had agreed to lend her a lump sum with which to pay the family creditors. She would pay the sum back over a period of 30 years. The court stopped Joseph from cross-examining Mary about her personal relationship with her friend because such questioning was not within the "rules [the court had] outlined," cautioning him not to "get into those questions." Mary testified that because of the present financial circumstances she, at times, bought the children second-hand clothing. She said that she and the children lived in an upper-middle class, professional neighborhood. She said she received some small monetary support from her brother who lived with the children and her.

The judge, without objection by either party, conducted an *in camera*

interview of the five children; a transcript of the session was made. The children indicated that they preferred to live with their father. Although the guardian *ad litem* attended the session, neither of the parties nor their attorneys were present.

At the conclusion of the August 1977 hearing the judge maintained the joint custody, but transferred the physical custody and "possession" of the children from their mother to their father. The order gave their mother liberal "visitation privileges." In making this change, the court said that the lives of the children were intertwined with the financial plight of the parents, noting:

> "At the time the case was decided before I saw the financial situation. It was almost incredible and I wanted to see whether or not my order that was entered at that time would work."

After another hearing concerning financial matters held in October 1977, the written order for divorce was entered and the property of the Carrolls was distributed pursuant to the new Marriage and Dissolution of Marriage Act. (Ill. Rev. Stat. 1977, ch. 40, par. 101 *et seq.*) The judge determined the marital debt to be $8,150. He ordered the parties to sell the Glencoe house, using the proceeds from the sale to pay this debt, the guardian *ad litem* expenses, Mary's attorney's fees and the child support arrearage Joseph owed Mary. After the payment of those costs, the remainder of the proceeds would be equally divided between the parties.

The first issue in the case concerns the propriety of the August 1977 order which transferred physical custody of the children from their mother to their father. The question presented is whether or not that August order was a modification of a permanent custody order made in January 1977. If it was a modification then the physical possession of the children could not be changed unless the father proved at trial that the mother was an unfit parent or that there was a material change of circumstances which necessitated the transfer for the welfare of the children. (*King v. Vancil* (1975), 34 Ill. App. 3d 831, 835, 341 N.E.2d 65, 68; *Vysoky v. Vysoky* (1967), 85 Ill. App. 2d 306, 310, 230 N.E.2d 3, 5.) If it was not a modification of a permanent custody order, then this court could only reverse the trial court's decision to place the children with their father if that decision was an obvious abuse of discretion, contrary to the manifest weight of the evidence and a manifest injustice. (*Rodely v. Rodely* (1963), 28 Ill. 2d 347, 192 N.E.2d 347.) For reasons set out below, we find that the August 1977 order, which transferred the physical custody of the children from their mother to their father, was a modification of the January 1977 custody decision.

Mary argues that the August 1977 decision was a post-decree modification of the January 1977 order which awarded joint custody of the children to both parents but left the children living with her. Under this

theory, the court's January 1977 determination, made subsequent to the judgment of divorce and after two days of evidence on the specific question of parental fitness, is conclusive of the custody issue. Mary reasons that the January 1977 joint custody decision definitely modified the temporary custody agreement entered two years earlier; the ruling in August, altering that January decision, then, is a post-decree modification of a custody judgment. Since judicial discretion to make post-decree modifications of custody is limited to situations where, by clear proof, there has been a material change of conditions or the parent with custody has been shown to be unfit, and since, according to Mary, neither circumstance was demonstrated at the August 1977 hearing, she argues that the judge abused his discretion in transferring the custody of the children.

Joseph, on the other hand, asserts that the judge never really altered the actual custody of the children from one party to another in August 1977 and, therefore, judicial discretion should not be limited by the strict standards Mary proposes. According to Joseph, the January 1977 joint custody order was not complete because "custodial arrangements" had yet to be determined. Only in August 1977 he says, did the judge finally determine those arrangements, one of them being the transfer of physical possession of the children from Mary to him. Since there has never been a change of custody and since the August 1977 order, not the January 1977 pronouncement, was the actual "final" award of custody, Joseph states that the "change in custody" standards should not apply. Rather, he urges, the plaintiff has the burden of proving on appeal that the trial court's order was an obvious abuse of discretion, contrary to the manifest weight of the evidence and a manifest injustice. Inasmuch as none of these conditions has been shown, Joseph contends the trial judge's determination, awarding physical custody of the children to him, must prevail.

■■ Custody cases require careful decision, and caution must be exercised in determining custody awards. The very nature of a divorce in a family is disrupting in the lives of the children involved. The strictures of the legal system should not operate to cause more chaos. The standard against which all actions must be measured in all custody cases, both by the trial court and the appellate court, should be the best interest of the child. (*Comiskey v. Comiskey* (1977), 48 Ill. App. 3d 17, 21, 366 N.E.2d 87, 90.) However, in an effort to achieve a situation which is beneficial to the children, a trial court cannot avoid the possible consequences of an order by making all orders temporary "experiments" to see which set of circumstances will result in the best living conditions for the children. (See *Pratt v. Pratt* (1975), 29 Ill. App. 3d 214, 330 N.E.2d 244.) As noted in *King v. Vancil* (1975), 34 Ill. App. 3d 831, 834-35, 341 N.E.2d 65, 68:

"[A child custody award] is probably one of the most difficult and important tasks a trial judge undertakes. However, the children and the parents are certainly entitled to a certain degree of finality and conclusiveness when an order of custody is entered. Custody of children is the most important aspect of divorce, and this matter should not be subject to frequent modifications where the order was not conditional with respect to such changes."

The trial judge characterized his original January 1977 order as just such an experiment when he said he wanted to "see whether or not my [January] order * * * would work."

■ While the order of January 1977 may not have been final for appeal purposes (*i.e.*, the property arrangements had yet to be determined and it was not a written order), it was a conscious modification of the two-year-old temporary custody arrangement. It came after the grant of divorce and after several days of testimony devoted solely to the custody question. Under the law applicable at that time all post-judgment orders of custody are "temporary" in the sense that they are subject to modification when the "best interest of the child requires." (*Pratt v. Pratt* (1975), 29 Ill. App. 3d 214, 215-16, 330 N.E.2d 244, 246; *People ex rel. Bukovich v. Bukovich* (1968), 39 Ill. 2d 76, 81, 233 N.E.2d 382.) Therefore, in January 1977, when the trial judge decided to award joint custody of the children and leave the children physically with their mother he made a custody decision with regard to the children. A child custody decision made under such circumstances can only be altered upon a showing of a substantial change in circumstances of the parties affecting the welfare of the children or upon a showing of unfitness of the party with physical custody. *King v. Vancil* (1975), 34 Ill. App. 3d 831, 835, 341 N.E.2d 65, 68.

■■ In August 1977, no evidence directly demonstrated the unfitness of either parent. Furthermore, no evidence showed that a material change occurred between January 1977 and August 1977 which threatened the children's best interest. The financial circumstances of the parties, as developed at the August hearing, were dire. The transfer of the children from their mother to their father can be read as an attempt to ease this monetary crisis by placing the children with the parent who, with the least amount of difficulty, could minister to their economic needs. However, the relative affluence of one parent over the other, without more, is not sufficient cause to transfer custody. (See *Vysoky v. Vysoky* (1967), 85 Ill. App. 2d 306, 311, 230 N.E.2d 3, 6; *Comiskey v. Comiskey* (1977), 48 Ill. App. 3d 17, 22, 366 N.E.2d 87, 91.) Similarly, the children's preference to live with one parent, although a factor to be considered, is not alone a sufficient change of circumstances to support a modification of a custody order. *Garner v. Garner* (1977), 46 Ill. App. 3d 56, 360 N.E.2d 373.

We cannot accept Joseph's characterization of the August 1977 order as

a mere custodial arrangement and not an actual change in custody. The court's grant of "joint custody" in this case was meaningless. Without outlining accommodations for control and care of the children between the parties, the physical possession award here had an effect identical to the taking of the children from the exclusive control of one parent and placing the children in the exclusive control of the other. There was never any attempt by court order to work out details of responsibility between the parties, other than granting the party without the physical custody of the children "visiting privileges." The change of physical possession from one parent to the other was not merely the adjustment of custodial arrangements. Practically, the change of physical possession of the children meant that the control and custody of the children went from one parent to the other. The legal consequences must acknowledge the practical effect. Since we find the January 1977 decision giving joint custody of the children to both parents but leaving the children in the physical possession of their mother to be a custody decision, and since no significant change in conditions occurred after that which would justify changing that decision, we reverse the August 1977 trial court order which awarded physical custody of the children to their father.

■■ A review of the record, however, demonstrates that Joseph's petition for modification of that January 1977 order had not been given a complete hearing in August 1977. The petition alleged that certain behavior on the part of Mary, because it detrimentally affected the children, made her an unfit custodian of the children. Although the trial judge specifically said that the August 1977 hearing was held to consider that petition, the record indicates that inquiry into the substance of it was not permitted. Therefore, we remand the case for consideration of Joseph's petition for a change of physical custody, so that if he still desires to proceed to a hearing he will not be deprived of that opportunity.

■■ The second issue in the case concerns the propriety of the October 1977 order as it pertains to the distribution of marital property. We vacate that judgment to permit the trial court to reevaluate the distribution in light of this ruling on the question of custody. In any event, reconsideration of the distribution of marital property is necessary because of the dispersal method used by the court in the October 1977 order. The October 1977 decision orders the sale of the house in Glencoe and the payment of the child support arrearage owed by Joseph from the proceeds of that sale, before division of those proceeds between the parties. The deduction of the arrearage from the proceeds before the division of the money has the effect of treating the arrearage as a marital debt, forcing Mary to absorb 50% of it. The arrearage is not a marital debt but a personal debt of Joseph, owed to Mary. Any new distribution order should treat it as such.

Mary argues on appeal that the court below erred when it determined the financial settlement of the case pursuant to the new Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 101 *et seq.*). She contends that it was unfair to adduce all of the financial evidence under the old act, which dictates one set of standards for distribution and employ a second set of standards, that of the new act, in actually making the order. Since we are remanding this case for a new hearing on the financial settlement, Mary will be given the opportunity to rectify any evidentiary injustice which may have been caused by the change of standards, and the judge should use the new act in making his settlement order.

The circuit court order giving physical custody of the children to their father is reversed. The question is remanded for determination of the custody arrangements and for a hearing concerning Joseph's petition to modify the January 1977 order.

The order of October 1977, as it pertains to the distribution of marital property, is vacated and the question is remanded for reconsideration of the property settlement, not inconsistent with this decision.

Reversed and remanded with directions.

SIMON and McGILLICUDDY, JJ., concur.