LOIS KRAFT, a/k/a Lois Lipton, Plaintiff-Appellant, *v.* BERTRAM KRAFT, Defendant-Appellee.

First District (4th Division)   No. 82—683

Opinion filed August 12, 1982.

Henry C. Krasnow and R. Peter Carey, both of Mandel, Lipton & Stevenson, Ltd., and Burton Joseph, of Lipnick, Barsy & Joseph, both of Chicago, for appellant.

Kaufman and Litwin, Ltd., of Chicago, for appellee.

Michele F. Lowrance, of Chicago, guardian *ad litem* for Rachel Kraft.

JUSTICE LINN delivered the opinion of the court:
This is an appeal from an order entered in the circuit court of Cook County on March 26, 1982, denying termination of joint custody but awarding "physical possession" of a seven-year-old minor child, Rachel Kraft, to her father, Bertram Kraft. Rachel's mother, Lois Lipton, maintains on appeal that the requirements for a change of "physical possession" or physical custody of a child provided by the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 610(b)(3)) were not met in this case, and that the trial judge's findings were contrary to the manifest weight of the evidence.

We affirm the denial of termination of joint custody. We reverse the award of "physical possession" to the child's father.

FACTS
Lois Lipton and Bertram Kraft were married on June 13, 1968. Their daughter Rachel was born on December 14, 1974. Lois and Bertram were divorced in Lake County on August 19, 1977, and a settlement agreement between them was approved by the court and incorporated into the divorce judgment. The agreement provided that Lois and Bertram would have joint custody of Rachel, and that Lois would have "physical possession" of Rachel during her minority, with Bertram having visitation rights. The visitation agreement specified that Rachel would be with Bertram every other weekend, every Tuesday afternoon, four weekends during Rachel's summer school vacation, and every other year on 14 specified holidays.

Both Lois and Bertram subsequently moved to Cook County. On August 28, 1979, Bertram filed a complaint in the circuit court of Cook County to have the Lake County divorce judgment registered in Cook County. The registration order was entered.

On April 15, 1980, Lois filed a petition in the circuit court of Cook County asking the court to terminate the joint custody of Rachel and award sole custody to Lois. Lois also requested that the court order Bertram to show cause why he should not be held in contempt for failure to pay $3,505 allegedly owed to Lois under the marital settlement agreement. On July 25, 1980, Bertram filed his petition asking the court to award sole custody of Rachel to him.

The trial of this case began on November 24, 1980, and ended 16 months later on March 25, 1982, with the entry of an order finding that "the minor child's health will be greatly effected [sic] if a change in physical custody is not made" and ordering that "the physical possession of the minor child, Rachel, is hereby awarded to Dr. Bertram Kraft." Lois was awarded visitation with Rachel on three of four weekends per month, and one evening during the fourth week. Provisions for other holiday and vacation visitation were to be made at a later time.

On September 1, 1980, in approximately the middle of the custody trial while Lois' attorney was out of the country, Bertram filed an emergency petition for temporary "physical possession" of Rachel. Bertram argued that Rachel "has suffered a personality defect as a result of being reared by her mother," and asked that he be given "physical possession" of Rachel so he could enroll her in school where he lives.

At the court's request for guidance, Rachel's guardian *ad litem*, gave her opinion that Bertram was asking for an early custody ruling and that it would be inappropriate to render that ruling at the current stage of the proceedings. The guardian *ad litem* also asserted that Rachel was not in serious danger, particularly in view of the conflicting psychiatric testimony that had been received up to that point in the trial. The guardian *ad litem* informed the court that she had talked to Rachel's teachers, who contradicted Bertram's claim that Rachel was "getting worse." The court nevertheless ordered that "physical possession" of Rachel be transferred instanter to Bertram for the 1981 fall school semester. The trial judge later stated that he had so ordered because he "wanted a trial run."

The September 1, 1981, order granting Bertram temporary "physical possession" of Rachel was stayed by this court on September 4, 1981. On September 15, 1981, this court vacated the trial

porary "physical possession" order and remanded the cause to the trial court with the direction that the custody proceedings be completed "with all possible promptness." The trial was completed more than six months later.

At trial, Lois had testified that she felt the joint custody arrangement was not working out because of Bertram's lack of cooperation with Lois in her efforts to foster Rachel's growth and development. Lois testified that Bertram criticized her and swore at her in Rachel's presence; that he told Rachel her mother did not love her; that he continuously discussed the custody arrangement with Rachel and instructed Rachel to tell the judge she wished to live with Bertram. Lois testified about an incident in which Bertram came to Lois' house demanding to see Rachel and smashed the glass in the back door.

Four psychiatrists and a psychologist testified as expert witnesses. The first to testify was Dr. Ner Littner, who had been a court-appointed psychiatrist in the Lake County divorce proceedings between Lois and Bertram. Dr. Littner testified that Lois and Bertram both had some minor character problems, but were functioning quite well. He felt, based on two interviews with Rachel, that Rachel was "functioning within normal limits." Dr. Littner testified that Lois has "excellent mothering capacity" and in his opinion it would be in Rachel's best interest to be in Lois' sole custody because Lois had been the one consistent person in Rachel's life. He felt it would be harmful to Rachel to remove her from her present living arrangement and "devastating" to Rachel to separate her from Lois.

Dr. Jack Arbit, a psychologist, was called as a witness by Bertram. He testified that Rachel has a very high I.Q., but was doing "less well" academically than she should with her high intellectual ability. Dr. Arbit testified that Rachel manifested narcissistic, egocentric, manipulative defenses against feelings of inadequacy caused by a lack of satisfaction of Rachel's passive dependency needs as a young child. He stated that Rachel was mildly depressed. Dr. Arbit's opinion was that Lois had caused Rachel's personality problems, and that Rachel should be in Bertram's custody. He also testified that Rachel was not anxious, her attention span was normal, and her verbal ability good.

Dr. Marshall Falk, a psychiatrist, was the next expert witness called by Bertram to testify. He testified that, when asked to draw a picture, Rachel drew Bertram and his present wife and family, not Lois. He said Rachel told him she wanted to live with Bertram. He observed no overt depression or emotional problems in Rachel; Rachel "related easily" and was inquisitive and bright. Although he felt Lois

594

was a concerned and loving parent, Dr. Falk's opinion was that Rachel should be in Bertram's custody.

Dr. Leonard Elkun, a psychiatrist, was called next by Bertram. He testified that Rachel was open, bright, active, and a "verbal exhibitionist," and that she suffered from "pseudomaturity" and "exhibitionistic grandiosity." Although Dr. Elkun never interviewed Lois, he testified on cross-examination that Bertram had told him Lois was independent and had difficulty "being able to adopt a more passive, more traditionally benign position." He stated that if placed in Bertram's custody, Rachel might develop a feeling of "potency."

Dr. Melvin Seglin was a court-appointed psychiatrist. He had interviewed Rachel, Lois and Bertram, and Lois and Bertram's current spouses. Bertram had told Dr. Seglin that he (Bertram) had been Rachel's nurturing parent while Lois went to law school. Rachel had told Dr. Seglin that she wanted to live with Bertram because she would have Bertram's stepson to play with and she has her own room and toys at Bertram's house. Rachel also told Dr. Seglin she had nicer friends at Bertram's house, and "Mary Beth [Bertram's present wife] buys Hostess Ding Dongs *** and Lois thinks they are crummy."

Because Rachel told Dr. Seglin something her father had told her to tell the doctor, Dr. Seglin felt there was a "possibility that she had been directly or indirectly rehearsed. *** It was almost as if it was all prepared ***." Dr. Seglin felt that Bertram was unaware or unconcerned about the damaging effect the prolonged litigation would have on Rachel. Lois, on the other hand, seemed to be very concerned about the effect of the custody battle on Rachel. Dr. Seglin's opinion was that Rachel was being influenced by Bertram and his present wife, who frequently discussed with Rachel "their intentions of having her."

Dr. Seglin stated that Rachel is too immature to make the decision about where she should live, and should not be asked to do so. She would not be harmed if her expressed wish to live with Bertram were not granted. If her wish were granted, she might develop a manipulative attitude toward other people. Dr. Seglin's opinion was that if Rachel were placed in Bertram's home her negative feelings would continue, supported by Bertram's attitude, and "it is going to interfere with her personality development."

Dr. Seglin's opinion was that Rachel's "interest would be best served in her mother's home" because "Lois and her husband have more regard for personal feelings, for human dignity, for emotional values than do the Krafts. I think that they [the Krafts] see things in a more superficial way. They are loving. I don't question that they

have the best intentions, but I think the emphasis seems to be on materiality in their home."

A number of lay witnesses were called by Lois. These witnesses included Lois' housekeeper, Rachel's first grade teacher, Lois' neighbors, and parents of Rachel's friends. All of them testified that Rachel is a bright, happy child and a good student, that Lois is a devoted and loving mother, and that Rachel and Lois have a good relationship. Bertram called no witnesses other than Doctors Arbit, Falk, and Elkun.

The trial judge examined Rachel himself. Rachel told him she would rather live at Bertram's house. Among the reasons Rachel gave for her preference were that there were more presents at Bertram's house; Lois comes home from work between five and six o'clock; Lois punishes Rachel when she does something wrong "most of the time" while at Bertram's house Rachel is punished "very few times"; Lois hasn't given Rachel all the toys she wanted; and Bertram buys Rachel plenty of clothes so that she has twice as many clothes as Lois does.

On March 25, 1982, the trial judge ordered that Lois and Bertram would continue to have joint custody of Rachel but that Bertram would have "physical possession" of Rachel during the week and on every fourth weekend. Holiday and vacation visitation was reserved for further determination. The order was based on the trial judge's findings that Rachel was not achieving her potential in school; that she was suffering from "pseudomaturity, lack of nurturing, and boredom"; and that the existing arrangement endangered Rachel's emotional stability and health.

OPINION

■ The parties do not dispute that a change in "physical possession" of a child, even though joint custody remains unchanged, is a custody modification governed by section 610(b) of the Illinois Marriage and Dissolution of Marriage Act. (*In re Marriage of Gargus* (1981), 97 Ill. App. 3d 598, 423 N.E.2d 193; *In re Marriage of Batchelor* (1980), 89 Ill. App. 3d 781, 412 N.E.2d 49; *Carroll v. Carroll* (1978), 64 Ill. App. 3d 925, 382 N.E.2d 7.) Section 610(b) provides in pertinent part as follows:

"(b) The court shall not modify a prior custody judgment unless it finds, upon the basis of facts that have arisen since the prior judgment or that were unknown to the court at the time of entry of the prior judgment, that a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interest of the child.

In applying these standards the court shall retain the custodian appointed pursuant to the prior judgment unless:

\* \* \*

(3) the child's present environment endangers seriously his physical, mental, moral or emotional health and the harm likely to be caused by a change of environment is outweighed by its advantages to him."

Ill. Rev. Stat. 1979, ch. 40, par. 610.

■■ Section 610(b) reflects the judgment that in post-dissolution custody proceedings the finality of the original custody order is more important than a redetermination of which parent should be the custodian. "[T]he drafters of the Marriage and Dissolution of Marriage Act clearly intended trial courts to have a broader range of discretion in making an initial custody determination than in considering a petition for modification of custody." (*In re Marriage of Atkinson* (1980), 82 Ill. App. 3d 617, 624, 402 N.E.2d 831, 836.) This rationale is even more persuasive where, as in this case, the initial custody determination was made by agreement between the parents themselves. Section 610(b) "reflects an underlying policy favoring the finality of child-custody judgments, and making their modification more difficult. \* \* \* By creating a presumption in favor of the present custodian, the legislature has sought to promote a stability and continuity in the child's custodial and environmental relationships which is not to be lightly overturned." *In re Custody of Harne* (1979), 77 Ill.2d 414, 420-21, 396 N.E.2d 499, 502.

*Harne* held that section 610(b) requires that a trial judge, before modifying a custody judgment, make explicit findings that one of its three subsections is applicable. Subsections (1) and (2) do not apply in this case, therefore the court was required to find that Rachel's present environment endangered her physical, mental, moral, or emotional health seriously enough to outweigh the harm likely to be caused by a change in her environment. After carefully reviewing the lengthy record, we find the trial judge's conclusion that "the present arrangement endangers the child's emotional stability and health" to be contrary to the manifest weight of the evidence.

■■ As the condensed statement of facts above illustrates, Rachel's physical health is normal. There were considerable differences of opinion among the expert witnesses about Rachel's emotional condition. Some of them stated that Rachel had no abnormal emotional responses. Others had found that Rachel was "pseudomature," exhibitionistic, and narcissistic as a result of lack of satisfaction of her need for nurturing from the time of infancy. We think it is significant to

note in this regard that although the trial judge seems to have assumed Lois was at fault for any deficiency in nurturing Rachel as an infant, Bertram claimed that he was Rachel's nurturing parent while Lois attended law school. Assuming the expert testimony was correct that Rachel was insufficiently nurtured as a young child, we could not and do not presume to assess blame for this problem against either Lois or Bertram. Both gave evidence of being loving, concerned and caring parents. However, because Rachel lived with both her parents until she was 2½ years old, and because section 610(b) requires that modification must be based on changes that occurred after the original custody judgment, we believe it was improper for the court to have considered any problems in Rachel's personality that have existed since her infancy, long before the divorce.

We also find the other testimony regarding Rachel's emotional condition to be insufficient evidence that she is seriously endangered by living in Lois' home. Rachel's report cards from her religious school and public school and the testimony of her first grade teacher indicate that Rachel has been a very good student, particularly in light of her being one of the youngest children in her class. It is unrealistic to claim that a little girl is failing to fulfill her intellectual potential because she is not number one in her first grade class. A related issue is whether Rachel is suffering from "pseudomaturity." In light of Rachel's high intelligence, and considering the effect this protracted custody litigation must have had on her, we do not consider her mature demeanor to be necessarily abnormal.

■■ ■ Under section 610(b)(3), the trial judge was required to find serious danger to Rachel in her present environment to justify his modification of the original custody judgment. What he found was that "[s]he is not achieving her potential, although she is doing well in school, she is not putting out her best. *** Rachel is suffering from lack of nurturing. She is suffering from pseudomaturity and boredom." This court has explained the appropriate standard of review of such findings as follows:

> "In determining whether the trial court abused its discretion, the question is not whether the reviewing court agrees with the trial court but rather did the trial court in the exercise of its discretion act arbitrarily without the employment of conscientious judgment or, in view of all the circumstances, exceed the bounds of reason and ignore recognized principles of law so that substantial injustice resulted." (*In re Marriage of Lee* (1979), 78 Ill. App. 3d 1123, 1127, 398 N.E.2d 126, 129.)

We think that those requirements for reversal of the trial court's or-

der have been met in this case. In light of all the evidence disclosed in the record, we believe the trial judge's finding that "the present arrangement endangers the child's emotional stability and health" is legally inappropriate and a "substantial injustice" was the result.

■■ We do not mean to imply by this finding that we believe all is well in Rachel's life. The antagonism between Bertram and Lois, in spite of each one's apparent love and devotion for the child, has undoubtedly been distressing to Rachel for years. This post-decree litigation has continued for over two years at the trial and appellate levels, and was continually discussed with Rachel. Rachel was interviewed by no fewer than seven psychiatrists and psychologists, three attorneys, and a judge. At least one of the expert witnesses and Rachel's guardian *ad litem* observed during the trial that this barrage of psychological probing and testing could not fail to exacerbate the problems of even the most normal child. In her interview with the trial judge, Rachel told the judge, "I am having problems." "What kind of problems are you having?" the judge asked. Rachel replied, "This fight." This history and the totality of the record before us compel us to conclude that the trial judge's decision, which would further disrupt Rachel's life by transferring her away from her mother's home, was contrary to the manifest weight of the evidence.

The order of the trial court retaining joint custody of Rachel Kraft is hereby affirmed. The transfer of "physical possession" from Lois Lipton to Bertram Kraft is reversed.

Affirmed in part; reversed in part.

JIGANTI and ROMITI, JJ., concur.