*In re* MARRIAGE OF KENNETH I. GOLDMAN, Petitioner-Appellant, and
ANNETTE C. GOLDMAN, Respondent-Appellee.

First District (4th Division)   No. 1—89—1025

Opinion filed March 30, 1990.—Rehearing denied May 7, 1990.

JOHNSON, J., dissenting.

Kenneth Ingram Goldman, *pro se*, and Kenneth Ditkowsky, of Ditkowsky & Contorer, both of Chicago, for appellant.

Chaim T. Kiffel and David M. Elston, both of Kirkland & Ellis, of Chicago, for appellee.

JUSTICE JIGANTI delivered the opinion of the court:

On March 23, 1989, an order was entered dissolving the marriage of petitioner Kenneth I. Goldman and respondent Annette C. Goldman. The petitioner appeals from a portion of the order compelling specific performance of the parties' antenuptial agreement that in the event the marriage was dissolved, the petitioner would obtain and deliver to the respondent a Jewish bill of divorcement known as a "get." Under Orthodox Jewish law, a get is necessary to dissolve the marriage and permit the woman to remarry. The petitioner also appeals from that portion of the order incorporating a previously entered custody order.

The first issue presented in this appeal concerns the enforceability of the terms of a document, known as a "ketubah," which was entered into as part of the religious marriage ceremony. Annette Goldman contends that the ketubah is a marital contract which requires the husband to obtain a get upon dissolution of the marriage. Kenneth Goldman contends that the ketubah does not constitute a marital contract; that if it is a contract, its terms are too vague to be specifically enforced; and, finally, that enforcement of the ketubah would violate his constitutional rights under the establishment and free exercise clauses of the first amendment (U.S. Const., amend. I) as well as under article I, section 3, of the Illinois Constitution (Ill. Const. 1970, art. I, §3).

The parties were married on May 27, 1979, in a Reconstructionist Jewish ceremony. Neither party was an Orthodox Jew at the time of the marriage; Annette Goldman became an Orthodox Jew during the course of the marriage. Shortly before the marriage ceremony, the parties signed a certificate of marriage called a ketubah. The ketubah is a document written in Aramaic and translated into English. The English translation contains the date and place of the ceremony and the names of the bridegroom and bride, then states as follows:

"The said Bridegroom made the following declaration to his Bride:

'Be thou my wife according to the law of Moses and Israel. I faithfully promise that I will be a true husband unto thee; I will honor and cherish thee; I will work for thee; I will protect and support thee, and will provide all that is necessary for thy sustenance, even as it beseemeth a Jewish husband to do. I also take upon myself all further obligations for thy maintenance, as are prescribed by our religious statute.'

And the said Bride has plighted her troth unto him, in affection and in sincerity, and has thus taken upon herself the fulfill-

ment of all the duties incumbent upon a Jewish wife.

This Covenant of Marriage was duly executed and witnessed this day according to the usage of Israel."

The ketubah was signed immediately before the ceremony while the parties were dressed in their wedding attire. They had not consulted a lawyer about the terms of the ketubah.

In May of 1984, Kenneth Goldman petitioned for dissolution of the marriage and custody of the parties' two children—Shoshana, born in 1980, and Daniel, born in 1982. Annette Goldman and the children were visiting Annette's parents in New Jersey at the time the petition was filed, and Kenneth was awarded temporary custody in an *ex parte* proceeding. Upon Annette's return to Chicago, she counterpetitioned for dissolution and requested custody of the children. The counterpetition was subsequently amended to include a count requesting specific performance of the ketubah, which Annette alleged constituted a premarital contract between the parties that the status of their marriage would be governed by Orthodox Jewish law. She further alleged that under Jewish law a marriage can be dissolved only upon the transfer from the husband to the wife of a document called a get. The counterpetition also stated that Annette was an Orthodox Jew and that her religion prohibited her from remarrying unless and until Kenneth obtained a get.

A trial was held on the specific performance count between November 18, 1988, and November 23, 1988. No issue was raised concerning the dissolution of the marriage. Annette Goldman testified that before she and Kenneth were married, Kenneth obtained an Orthodox get for his ex-wife, Pauline Gethner, from whom he had been civilly divorced for almost two years. When Annette questioned the need for the get, Kenneth told her that he wanted the divorce to be recognized by everyone, including the State of Israel and every faction of Judaism. He also stated that "when you get married in the Jewish faith you have to get divorced according to the Jewish faith." Annette's testimony concerning these statements was uncontroverted.

Annette further testified that prior to the marriage, she and Kenneth went to a Jewish bookstore to choose a ketubah. Kenneth specifically asked the clerk for an Orthodox ketubah. Annette stated that it was her understanding from conversations with Kenneth and from books and pamphlets given to her by Kenneth that the ketubah was a contract and that the words "[b]e thou my wife according to the law of Moses and Israel" meant that Orthodox Jewish law would govern the status and validity of the marriage. Annette further stated that it was her understanding from the information given to her by

Kenneth that if the marriage were to be dissolved, "[t]hat we would have to have a get given in the proper way. That that would be important to the Orthodox procedure." Annette admitted, however, that she and Kenneth never specifically discussed whether he would give her a get in the event the marriage was dissolved.

Approximately six months before the wedding, the parties met with Rabbi Rachlis, the rabbi who was to officiate at the marriage ceremony. When he learned that Kenneth had been married before, he asked whether Kenneth had given his first wife a get. Upon learning that he had, Rabbi Rachlis stated, "Good, that eliminates problems." According to Annette, the two witnesses to the signing of the ketubah were Orthodox Jewish males, a requirement under Orthodox Jewish law.

Annette testified that she became an Orthodox Jew after her father died and that it was her understanding that Orthodox law prohibited her from remarrying unless she obtained a get from Kenneth. If she remarried, her marriage would not be recognized by her religion and any children she might have would be considered illegitimate. During the course of the custody trial in 1986, she asked Kenneth for a get. He replied that she was a liar and a cheat and that she was "going to pay" for what she had done to him by being married to him for the rest of her life. He then stated that "everything could be resolved" if Annette would agree to joint custody of the children. Barbara Fox, who at one time served as a court-appointed attorney for the children, testified that Kenneth told her that he "would not be adverse to giving [Annette] a Jewish divorce" if he got his custody terms. Kenneth did not deny making these statements to Annette or to Barbara Fox. According to Annette, Kenneth at no time stated any religious objection to obtaining a get.

Annette then presented expert testimony by two Orthodox Jewish rabbis, Rabbi Gedalia Schwartz and Rabbi Emanuel Rackman. According to the expert witnesses, Judaism is not only a religion but is also a complete body of substantive law. Jewish law contains both religious rules and secular laws, including such matters as contracts, torts, property and family law. Marriage and divorce are secular, contractual undertakings. Although a rabbi is usually present to supervise the marriage ceremony, his presence is not required. Therefore, the religious persuasion of the clergyman officiating at a wedding does not affect the validity of the marriage.

Both expert witnesses testified that the ketubah signed by the parties was a contract. The words "[b]e thou my wife according to the law of Moses and Israel" meant that the status of the marriage would

be governed by Orthodox Jewish law. The experts agreed that the termination of the marriage under Orthodox law required the giving of a get. They stated that many non-Orthodox couples followed the get procedure so that the divorce would be recognized by all Jews. A woman who does not receive a get is relegated to the status of an "agunah"; as such, she is prohibited from remarrying or having sexual relations with any man. If she does remarry and has children, the children would be considered illegitimate and would be prohibited from marrying other Jews.

The experts testified that although the get procedure involves several formalities, it is secular rather than religious in nature. A rabbi is ordinarily present but is not necessary to the procedure. The husband obtaining the get need not profess any religious belief or engage in any act of worship. Essentially, a get is a written release from the marriage contract. The husband appoints a scribe to draft the 12-line document in conformance with certain prescribed formalities. The husband then signs the document in the presence of two Orthodox Jewish male witnesses and gives it to the wife, stating that she is released from the marriage in accordance with the laws of Moses and Israel. The husband may authorize the get procedure to be done by proxy. Although the witnesses stated that a get must ordinarily be voluntarily given, a certain amount of coercion would be permissible in this case because Kenneth had effectively abandoned Annette. Kenneth did not present any expert witnesses to contradict the testimony of Rabbi Schwartz and Rabbi Rackman.

Kenneth Goldman testified that he considered the ketubah to be poetry or art rather than a contract. In an evidence deposition Rabbi Rachlis, who officiated at the marriage ceremony, stated that from his perspective as a liberal Jew he viewed the ketubah in a symbolic rather than a literal sense. Kenneth testified that he could not read the Aramaic text and the English translation did not contain any reference to divorce or a get. He stated that neither he nor Annette was an Orthodox Jew at the time of the ceremony and denied discussing the terms of the ketubah or the meaning of the words "[b]e thou my wife according to the law of Moses and Israel" with Annette prior to the marriage. Kenneth then testified at great length as to his dislike for Orthodox Judaism. He stated that Orthodox Jews discriminate against women, and characterized Orthodox Jews as "antimodern" and repulsive.

Following the trial, the court stated its findings in a memorandum opinion. The opinion included findings of fact that the parties' intent at the time they signed the ketubah was to have the marriage recog-

nized by the Orthodox branch of Judaism and that, based on the expert testimony, "the ketubah clearly and unequivocally obligates the husband to proceed with the get procedure." The court also found that although Kenneth had an intense dislike for Orthodox Judaism, his feelings did not rise to the level of a religious belief.

The court then entered an order dissolving the marriage and ordering Kenneth to comply with his contractual obligation to give Annette an Orthodox get, which the order defined as a get recognized by an Orthodox Beth Din (rabbinical tribunal). The order specifically provided that it was not requiring the Beth Din to grant the get and that the court would not supervise the procedure, determine who was a qualified witness or review whether the Beth Din made a correct determination under Jewish law. The order did, however, require Kenneth to truthfully answer all questions put to him and "to participate in the verbal and physical acts necessary to validate the GET." The order then gave Kenneth the following four options for compliance:

"A. Kenneth Goldman may obtain and give Annette Goldman a GET in a manner that is recognized as valid by an Orthodox Beth Din.

B. Kenneth Goldman may appear before an Orthodox Beth Din and give them the information and authorization necessary to proceed with and validate the GET procedure.

C. Kenneth Goldman may execute the necessary documents and provide the necessary information to authorize the giving of a valid Orthodox GET by proxy as determined by an Orthodox Beth Din.

D. Kenneth Goldman may appear before the Chicago Rabbinical Council and give them the information and authorization necessary to proceed with and validate the GET procedure."

The order of dissolution also incorporated a previously entered custody order. The facts relating to the custody order will be detailed later in connection with our discussion of the issues concerning that order.

Kenneth Goldman contends that the trial court erred in ordering him to obtain a get for three reasons. First, he maintains that the ketubah was not a contract but was intended by the parties as mere poetry or art. Second, he argues that if the ketubah was a contract, its terms were too vague to support specific performance. Third, he claims that the order violates his constitutional rights under the establishment and free exercise clauses of the Federal Constitution and article I, section 3, of the Illinois Constitution.

The question of whether the parties intended to enter into a contract is an issue to be decided by the trier of fact. (*Northern Illinois Construction Co. v. Zale* (1985), 136 Ill. App. 3d 822, 824, 483 N.E.2d 1013.) The determination in that regard will not be reversed unless it is contrary to the manifest weight of the evidence. *Howard A. Koop & Associates v. KPK Corp.* (1983), 119 Ill. App. 3d 391, 398, 457 N.E.2d 66.

■■ Kenneth Goldman maintains that regardless of whether the ketubah, quoted earlier, contains the essential elements of a contract, it was not intended as a contract but merely as poetry or art in connection with the marriage ceremony. To support this claim, Kenneth states that the parties did not negotiate the terms or consult with a lawyer and that the document was signed shortly before the ceremony while the parties were dressed in their wedding attire. On the other hand, Annette Goldman presented testimony, which the trial court accepted as true, that she and Kenneth went to a Jewish bookstore and specifically requested an Orthodox Jewish ketubah. Annette testified that it was her understanding from talking to Kenneth and reading certain materials supplied by him that the ketubah was a contract and the words "[b]e thou my wife according to the law of Moses and Israel" meant that the status and validity of the marriage would be governed by Orthodox Jewish law. Although Kenneth denied these discussions, it was well within the authority of the trial court to determine the credibility of the witnesses and the weight to be given their testimony. Also, the ketubah on its face contains language of consideration and mutual promises. In our view, the court's determination that the parties intended the ketubah as a contract was not against the manifest weight of the evidence.

Kenneth Goldman next argues that even if the ketubah was a contract, the terms of the contract were too vague to support specific performance of the obligation to obtain a get. He maintains that the ketubah contains no reference to divorce or to the obligation to secure a get in the event the marriage was terminated.

■■ In a bench trial, the meaning of the language used by the parties in a contract is to be determined by the trial court as an issue of fact. (*Westminster I Apartments v. Barnard* (1987), 163 Ill. App. 3d 36, 37, 516 N.E.2d 476.) When the language of the contract leaves the intent of the parties in doubt, extrinsic evidence is admissible to resolve the conflict. (*Chicago Principals Association v. Board of Education* (1980), 84 Ill. App. 3d 1095, 1099, 406 N.E.2d 82.) In resolving the conflict, the court will use accepted methods of contract interpretation, including the use of expert testimony, to ascertain the intent of

the parties with respect to the contract terms. *Howard A. Koop & Associates v. KPK Corp.* (1983), 119 Ill. App. 3d 391, 398, 457 N.E.2d 66.

■ As we have stated, the trial court properly found that the parties intended the ketubah to be a contract that the status and validity of their marriage would be governed by Orthodox Jewish law. The uncontroverted expert testimony presented at trial established that Orthodox Jewish law requires the husband to obtain and deliver to his wife an Orthodox get upon dissolution of the marriage. Rabbi Schwartz testified that although the giving of a get is ordinarily a voluntary act on the part of the husband, a certain degree of compulsion is acceptable under the circumstances presented here, where Kenneth abandoned Annette and refused to cohabit with her and support her according to the terms of the marriage contract. Kenneth Goldman presented no expert testimony to the contrary. Before ordering specific performance of a contract, a court must find that its terms are sufficiently certain and definite that the court can require the specific thing contracted for to be done. (*Kalkounos v. Four K's, Inc.* (1981), 94 Ill. App. 3d 1011, 1013, 419 N.E.2d 503.) We believe that the court's order of specific performance was justified by the evidence before it.

Finally, Kenneth Goldman claims that enforcement of the ketubah would violate his constitutional rights under the Federal and State Constitutions. Specifically, Kenneth relies upon the establishment and free exercise clauses of the first amendment and upon article I, section 3, of the Illinois Constitution.[1]

In *Lynch v. Donnelly* (1984), 465 U.S. 668, 79 L. Ed. 2d 604, 104 S. Ct. 1355, a case involving the issue of whether a city's inclusion of a Nativity scene in its annual Christmas display violated the establishment clause, the Court stated:

> "Rather than mechanically invalidating all governmental conduct or statutes that confer benefits or give special recognition to religion in general or to one faith—as an absolutist approach would dictate—the Court has scrutinized challenged legislation or official conduct to determine whether, in reality, it establishes a religion or religious faith, or tends to do so." (*Lynch,*

---

[1]Briefly, the establishment clause bars the State from placing its official support behind a religion, while the free exercise clause bars the State from interfering with the religious practices of its citizens. The Illinois Constitution provides in part that "[n]o person shall be required to attend or support any ministry or place of worship against his consent, nor shall any preference be given by law to any religious denomination or mode of worship." Ill. Const. 1970, art. I, §3.

465 U.S. at 678, 79 L. Ed. 2d at 613, 104 S. Ct. at 1361-62.) Although it disclaimed a "fixed, *per se* rule" in conducting analyses under the establishment clause, the Court stated that it "often found it useful to inquire whether the challenged law or conduct has a secular purpose, whether its principal or primary effect is to advance or inhibit religion, and whether it creates an excessive entanglement of government with religion." (*Lynch*, 465 U.S. at 679, 79 L. Ed. 2d at 613, 104 S. Ct. at 1362, citing *Lemon v. Kurtzman* (1971), 403 U.S. 602, 612-13, 29 L. Ed. 2d 745, 755, 91 S. Ct. 2105, 2111.) Applying the analysis used in *Lemon v. Kurtzman*, the Court held that the city's action in displaying the Nativity scene did not violate the establishment clause.

■ Using the analysis employed in *Lynch v. Donnelly* and *Lemon v. Kurtzman*, we conclude that the government conduct in question here, *i.e.*, the trial court order, does not violate the establishment clause. First, the order has the secular purpose of enforcing a contract between the parties. The right to enter into contracts is recognized by both the Federal and State Constitutions. (U.S. Const., art. I, §10; Ill. Const. 1970, art. I, §16.) Also, the court order furthers two secular purposes set forth in the Illinois Marriage and Dissolution of Marriage Act: "[To] promote the amicable settlement of disputes that have arisen between parties to a marriage; [and to] mitigate the potential harm to the spouses and their children caused by the process of legal dissolution of marriage." (Ill. Rev. Stat. 1987, ch. 40, pars. 102(3), 102(4).) The evidence at trial established that under the Orthodox Jewish law, which the parties agreed would govern the status of their marriage, the marriage could be dissolved only by the securing of an Orthodox get. Without the get, Annette was prohibited by her religious beliefs from remarrying. It would have been detrimental to the parties and their children to leave the get issue unresolved.

Second, it is our opinion that the primary effect of the court order was to further the secular purposes stated above and not to advance or inhibit religion. Although the order required Kenneth's participation in an Orthodox Jewish practice, there was ample expert testimony that Judaism contains both secular and religious laws and that the get procedure was secular in nature. To comply with the court order, Kenneth need not engage in any act of worship or profess any religious belief. According to the expert witnesses, the acquisition of a get is a secular act which severs the marriage contract. To the extent that the court order advances Orthodox Judaism by requiring an Orthodox get, it is an incidental effect of the enforcement of the parties' contract that Orthodox Jewish law govern the status of their marriage.

Third, we believe that the court order avoids an excessive entanglement with religion. In resolving disputes involving religion, a court may apply objective, well-established principles of secular law, or "neutral principles of law," which do not entail a consideration of doctrinal matters. (*Jones v. Wolf* (1979), 443 U.S. 595, 602-03, 61 L. Ed. 2d 775, 784, 99 S. Ct. 3020, 3025.) Here, the trial court merely applied well-established principles of contract law to enforce the agreement made by the parties. The terms of the order were carefully limited to avoid interference with religious doctrine. Our determination that enforcement of the obligation to obtain a get does not violate the establishment clause is in accord with decisions of other courts which have considered the issue. See *Avitzur v. Avitzur* (1983), 58 N.Y.2d 108, 446 N.E.2d 136; *Burns v. Burns* (1987), 223 N.J. Super. 219, 538 A.2d 438; *Minkin v. Minkin* (1981), 180 N.J. Super. 260, 434 A.2d 665.

■ Kenneth Goldman also contends that the court order violates the free exercise clause. Neither in the trial court nor in his brief on appeal has Kenneth clearly articulated in what manner the court order requiring him to obtain a get prevented the free exercise of his religion. Kenneth testified that he was a liberal Jew and that he abhorred the practices of Orthodox Jews, whom he characterized as discriminatory, repulsive and "antimodern." In its findings of fact, the trial court stated that although Kenneth expressed distaste for many practices of Orthodox Jews, he at no time attacked their religious beliefs. The court accordingly found that Kenneth's dislike for Orthodox Judaism did not rise to the level of religious belief. Only religious as opposed to personal or philosophical beliefs are protected by the free exercise clause. (*Wisconsin v. Yoder* (1972), 406 U.S. 205, 215-16, 32 L. Ed. 2d 15, 25, 92 S. Ct. 1526, 1533.) The court's finding in this regard is supported by the fact that Kenneth gave his first wife a get and by testimony that Kenneth was withholding the get as a bargaining tool in the custody dispute. Furthermore, the court order here requires Kenneth to do nothing more than what he promised to do when he signed the ketubah. Expert testimony established that the get procedure was secular in nature and did not require Kenneth to engage in any act of worship or to express any religious belief. Under these circumstances, we find Kenneth's argument involving the free exercise clause to be without merit.

■ Kenneth then maintains that the order violates article I, section 3, of the Illinois Constitution, which provides:

"No person shall be required to attend or support any ministry or place of worship against his consent, nor shall any prefer-

ence be given by law to any religious denomination or mode of worship." (Ill. Const. 1970, art. I, §3.) Kenneth has failed to cite any cases interpreting this provision and has not suggested that it provides greater or different protection than that afforded by the first amendment of the Federal Constitution. The Illinois Supreme Court has stated that provisions of the Illinois Constitution which are similar to provisions of the Federal Constitution will be construed as providing similar protection unless there is some indication that the drafters intended otherwise. (*People v. Porter* (1988), 122 Ill. 2d 64, 77, 521 N.E.2d 1158.) Because Kenneth has failed to provide any authority that Article I, section 3, was intended to provide protection different from that afforded by the establishment and free exercise clauses of the first amendment, we must reject this challenge to the trial court's order.

■ Kenneth Goldman next contends that the trial court erred in incorporating a previously entered custody order into its judgment of dissolution of marriage. Kenneth maintains that the previous order, entered on May 19, 1986, was a temporary custody order and that he was entitled to a trial on custody pursuant to the best interest of the child standard set forth in section 602 of the Illinois Marriage and Dissolution of Marriage Act (Act) (Ill. Rev. Stat. 1987, ch. 40, par. 602) before a final custody order was issued. Annette Goldman contends that the May 19, 1986, order was a final custody order which could be modified only upon clear and convincing evidence of changed circumstances as set forth in section 610 of the Act. Ill. Rev. Stat. 1987, ch. 40, par. 610.

In February of 1986, Kenneth filed a motion requesting an immediate hearing on the issue of custody. Trial of the custody issue began on May 12, 1986, before Judge Baner and lasted four days. Eleven witnesses, including expert witnesses, testified. On May 19, 1986, the court entered a nine-page order covering all aspects of the children's custody. The order stated that it was "entered as a temporary order which shall, in the absence of any contrary order entered hereafter, become a permanent custody order upon the entry of a Judgment of Dissolution in this cause." The court explained that it did not label the custody order final prior to the judgment of dissolution because of the possibility that the marriage would ultimately not be dissolved.

A custody order is temporary or final according to its substance rather than its form. (*Levy v. Skilling* (1985), 136 Ill. App. 3d 727, 729, 483 N.E.2d 917; *In re Marriage of Kondos* (1982), 109 Ill. App. 3d 615, 618, 440 N.E.2d 1046.) In *Kondos*, the court held that an order entered after a full testimonial hearing on all aspects of custody

was a final order despite the trial court's characterization of the order as temporary.

Kenneth's main argument is that because the order was not final for purposes of appeal (see *In re Marriage of Leopando* (1983), 96 Ill. 2d 114, 449 N.E.2d 137), it was merely a temporary custody decision governed by the standards of sections 602 and 603 of the Act. This argument has been previously considered and rejected. (*In re Marriage of Mitchell* (1981), 103 Ill. App. 3d 242, 246, 430 N.E.2d 716; *Carroll v. Carroll* (1978), 64 Ill. App. 3d 925, 382 N.E.2d 7.) It is clear from both the substance of the May 19, 1986, order and the comments of Judge Baner that the order was a final custody decision which could be modified only pursuant to the stricter standards set forth in section 610 of the Act.

■■ Kenneth further argues that because certain portions of the order, such as the requirements of enrolling the children in a particular day-care center and using a neutral party to assist in transfers of the children, were either impossible to meet or were ignored by the parties, the order was "stale" and constituted a "nullity." No authority is cited in support of the argument that situations which were not foreseen by the court and which the parties were able to resolve served to render the custody order a nullity. We find the argument unpersuasive.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

McMORROW, P.J., concurs.

JUSTICE JOHNSON, dissenting:

I respectfully disagree with the majority. The true issue in this case is whether a civil court has the authority to compel a party to perform terms of a "ketubah," *i.e.*, an antenuptial agreement used by Orthodox Jews, which require interpretation of religious doctrines and religious worship. Petitioner argues that the trial court's order compelling him to perform the terms of the ketubah violates his constitutional rights under the first amendment (U.S. Const., amend. I) and under section 3 of article I of the Illinois Constitution (Ill. Const. 1970, art. I, §3). Petitioner also argues that the terms of the ketubah were too vague to support the specific performance of obtaining a "get," *i.e.*, a Jewish bill of divorcement.

After the trial in this matter, the judge ordered specific performance of the ketubah, which included the following provision: "Be thou

my wife according to the law of Moses and Israel." Expert testimony given by two Orthodox Jewish rabbis and accepted by the trial court established that the provision "meant that [the] status of the marriage would be governed by Orthodox Jewish law." Orthodox law requires the ex-husband to give a "get" to his former wife in order to have the divorce between the parties recognized by all Jewish people. Respondent testified that she believed that Orthodox law requires a get if a divorced woman desires to remarry and have that marriage recognized by the Jewish religion. Otherwise, the church refuses to recognize the remarriage as valid and views any issue from the remarriage as illegitimate. Petitioner testified that he did not practice Orthodox Judaism and that he found the beliefs and practices to be "antimodern" and repulsive.

It is a long-standing rule in Illinois that the civil court will not interfere in questions involving religious dogmas unless they have consequences upon civil or property rights. (*Chase v. Cheney* (1871), 58 Ill. 509.) In *Chase* our supreme court declined to decide the issue of whether a Protestant Episcopal clergyman had breached his employment contract by refusing to recite language prescribed by the religious canons in the ministration of an infant baptism, a church ritual. The court reasoned that the clergyman was a voluntary member to the church association to which he belonged and that he voluntarily adhered to the rules, laws, and canons of the church. No property right had vested under the employment contract so as to authorize the civil court to become involved in a matter which necessarily required the interpretation of religious doctrines and canons of the church.

Religious worship includes performing external acts and observing all ordinances and ceremonies practiced by the religious association to which one belongs. The free exercise and enjoyment of religious worship, or lack thereof, is protected by the constitution. (*Chase*, 58 Ill. at 533-34.) Our "constitution intended to guarantee, from all interference by the State, not only each man's religious faith, but his membership in the church, and the rites and discipline which might be adopted." (*Chase*, 58 Ill. at 537.) There are two exceptions to this uncontrolled liberty, and neither applies here. Any order of the court which requires extensive investigation and evaluation of religious doctrines and tenets is prohibited by the first amendment. *Baumgartner v. First Church of Christ, Scientist* (1986), 141 Ill. App. 3d 898, 906.

Here, determination of whether a civil court can compel specific performance of a form of religious worship does not involve consequences upon petitioner's property rights, nor was there any effect

upon petitioner's civil rights before the trial court's order of specific performance. Furthermore, the trial court's construction of the provision, "Be thou my wife according to the law of Moses and Israel," required the court to partake in evaluation, investigation and interpretation of religious dogma. I do not suggest that the trial court was without authority to make a ruling on the contract; rather, that the court must not compel petitioner to participate in any performance of a provision within the contract which necessarily required interpretation of a religious doctrine and his involvement in an act of religious worship.

The majority reports that the trial court "found that although Kenneth had an intense dislike for Orthodox Judaism, his feelings did not rise to the level of a religious belief." (196 Ill. App. 3d at 791.) The inference here is that since petitioner's dislike for Orthodox Judaism did not qualify as a religious belief, his beliefs will not be protected under the Federal or State Constitutions and, therefore, he can be compelled to participate in acts which constitute religious worship. I agree that petitioner's dislike of Orthodox Judaism does not qualify as a religious belief; nevertheless, our constitution protects his right to freely choose whether he will participate in acts of religious worship. An individual's participation, even by proxy, in a religious ritual is a form of religious worship. The civil court has no right to dictate one's religion or the form in which one practices the religion of his choice. Our constitutions allow us to make these choices voluntarily. We must remember that one is free to seek such membership and to accept or abandon all of its rules, laws and canons at his will. Freedom of religious worship cannot be maintained if the civil courts attempt to construe and enforce ecclesiastical laws and doctrines and compel voluntary members to comply with them. This is what the majority attempts to to do here. The trial court's order compelling petitioner to engage in the observance of the ordinances and ceremonies of the Orthodox Jewish religion abrogates the very essence of freedom of choice concerning matters of religious worship.

Furthermore, the civil court is limited to dissolving the marriage between the parties in accordance with the Illinois Marriage and Dissolution of Marriage Act. (Ill. Rev. Stat. 1983, ch. 40, par. 101 *et seq.*) There is no reference in that Act to a requirement of a "get" for a valid dissolution of marriage under the civil law. Accordingly, we are prohibited from compelling one to follow religious tenets to fulfill ritualistic requirements of the church. Again, we must leave such a decision to the discretion of the individual.

Additionally, I do not believe that the terms of the ketubah were

800

so definite and certain as to allow the court to require the specific thing contracted for to be performed. The standard for enforcing specific performance of a contract prohibits the court from making a contract for the parties and enforcing it. (*Kalkounos v. Four K's, Inc.* (1981), 94 Ill. App. 3d 1011, 1013.) Here, the trial court's order, which expressed four specific options for compliance with the ketubah, cannot be distinguished from the court making a contract for the parties. The trial court's order, which expresses the four options necessary for petitioner's compliance, would not be necessary had it, indeed, found that the terms of the ketubah were sufficiently certain and definite so as to determine what was specifically contracted for. The expression of the precise options available for compliance with the ketubah should have been left to the parties to determine and include in their agreement. Even if this were the case, this court would be precluded from compelling specific performance of religious rituals in the event of a dispute between the parties concerning the meaning of a contract provision based upon a religious tenet.

I would reverse the judgment of the trial court.