[Cite as *Total Quality Logistics, L.L.C. v. Tucker, Albin & Assocs.*, 2022-Ohio-1802.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| TOTAL QUALITY LOGISTICS, LLC, | : | CASE NO. CA2021-06-031 |
| Appellant, | : | O P I N I O N<br>5/31/2022 |
| | : | |
| - vs - | : | |
| | : | |
| TUCKER, ALBIN AND ASSOCIATES,<br>et al., | : | |
| | : | |
| Appellees. | | |

CIVIL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2019 CVH 01237

Lindhorst & Dreidame, and Barry F. Fagel and Elizabeth M. Johnson, for appellant.

Statman, Harris & Eyrick, and William B. Fecher, for appellees.

**M. POWELL, P.J.**

{¶ 1} Total Quality Logistics, LLC, ("TQL") appeals the judgment of the Clermont County Court of Common Pleas granting summary judgment to appellees, Tucker, Albin and Associates ("Tucker") and Chris Reed ("Reed"), on its claims for breach of contract and punitive damages and its request for a permanent injunction. TQL also appeals the judgment of the trial court dismissing, under Civ.R. 12(B)(6), its claim for tortious

interference with contract and/or business relationships.

{¶ 2} TQL is a freight broker that arranges transportation of goods for its customers with third-party trucking companies. In this case, TQL arranged for Daansa Services, LLC ("Daansa"), to transport a load of goods to Prestige Kitchen and Bath ("Prestige"), a customer of The Corsi Group. Daansa had signed a Broker-Carrier Agreement with TQL, paragraph 4(b) of which pertinently states that Daansa may seek payment only from TQL:

> CARRIER [Daansa] agrees that BROKER [TQL] is the sole party responsible for payment of CARRIER's invoices related to the Services and that, under no circumstances, will CARRIER contact or seek payment from any CUSTOMER or any other party responsible for any payment related to the Services. CARRIER waives any right to collect from CUSTOMERS, unless BROKER provides CARRIER with consent in a writing[.]

{¶ 3} A dispute developed between TQL and Daansa concerning the Corsi load, and TQL refused to pay Daansa, leaving Daansa with an account receivable on its balance sheet. Daansa sold the account to Tucker, a Texas company that purchases accounts receivable from trucking companies and tries to collect.

{¶ 4} On September 11, 2019, Tucker began efforts to collect upon the Daansa account. Reed, one of Tucker's collections agents, called Prestige and demanded payment on the Daansa account. This call spawned a series of communications that day. Unsure what to do, Prestige emailed Corsi about the call, noting, "I guess TQL did not pay the trucking company." Corsi forwarded Prestige's email to Kevin Fitzgerald at TQL, who evidently called Reed right away, because Reed sent Fitzgerald a follow-up email, stating, "Yes I agree calling 3rd parties creates hassle however it is part of the process." Fitzgerald responded that he was transferring the matter to TQL's legal department. Shortly after, TQL legal-claims specialist Amy Unger sent Reed an email telling him plainly that under the Broker-Carrier Agreement payment may be sought only from TQL and that contacting anyone else about payment violates the Agreement. Unger further told Reed, "Besides

being a blatant breach of our Agreement, contacting its customers is not something TQL takes lightly. * * *  We will work with you on any payment disputes that you represent, but this unlawful contact is not something we will abide."

{¶ 5}  Less than a month later, on October 4, 2019, TQL filed suit against Tucker and Reed (herein collectively referred to as Tucker), asserting claims for breach of contract, tortious interference with contract and/or business relationships, and punitive damages. The complaint alleged that Tucker is bound by the Broker-Carrier Agreement signed by Daansa, because Tucker either is the assignee of Daansa's account receivable or was acting as Daansa's agent.  In addition to punitive damages, the complaint sought compensatory damages for injury to business goodwill, attorney fees, and costs.  The complaint also sought "injunctive relief prohibiting the Defendants, or their agents, from contacting or suing any TQL customers, or TQL's customers' customers, demanding payment for invoices allegedly owed to trucking companies."

{¶ 6}  Tucker filed a motion to dismiss TQL's tortious interference claim under Civ.R. 12(B)(6).  On May 22, 2020, the trial court granted the dismissal motion, concluding that the complaint failed to allege that Tucker's actions caused a breach in TQL's relationship with a third party or caused the breach of a contract that existed between TQL and a third party. Tucker later filed a motion for summary judgment on the breach-of-contract and punitive-damages claims and separately filed a motion for summary judgment on the request for an injunction.  On May 21, 2021, the trial court ruled on both summary-judgment motions together.  The court granted summary judgment for Tucker on the breach-of-contract and punitive-damages claims as well as on TQL's permanent-injunction request.  The court found that while Tucker had violated the Agreement, TQL failed to show that it suffered injury to goodwill as a result.  Additionally, because TQL failed to show damages and failed to show that Tucker threatened imminent and irreparable harm, the court declined to grant

injunctive relief.

{¶ 7} TQL now appeals, raising two assignments of error.

{¶ 8} Assignment of Error No. 1:

{¶ 9} THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT GRANTED DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT.

{¶ 10} TQL first challenges the trial court's May 21, 2021 decision granting summary judgment for Tucker regarding TQL's claim for breach of contract and request for injunctive relief. TQL argues that the trial court erred by finding that it failed to show damage caused by Tucker's violation of paragraph 4(B) of the Broker-Carrier Agreement. TQL maintains that its goodwill was injured because of Reed's call to Prestige, because it suggests to TQL's customers that TQL does not always pay the companies who might transport their goods. TQL also argues that the trial court erred by finding that it failed to show imminent and irreparable harm. TQL contends that Tucker will continue to violate the Agreement without an injunction prohibiting it from doing so.

{¶ 11} Under Civ.R. 56(C), summary judgment is proper when the movant demonstrates "that there is no issue as to any material fact, that the moving party is entitled to judgment as a matter of law, and that reasonable minds can come to but one conclusion, and that conclusion is adverse to the nonmoving party." *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 617, 1998-Ohio-178. We review a trial court's ruling on a summary-judgment motion de novo, that is, without deference to the trial court's decision. *Shannon v. Fischer*, 12th Dist. Clermont No. CA2020-05-022, 2020-Ohio-5567, ¶ 13. "De novo review means that this court uses the same standard that the trial court should have used, and we examine the evidence to determine whether as a matter of law no genuine issues exist for trial." *Morris v. Dobbins Nursing Home*, 12th Dist. Clermont No. CA2010-12-102, 2011-Ohio-3014, ¶ 14.

- 4 -

{¶ 12} A plaintiff seeking to recover on a claim for breach of contract must prove not only a contractual violation but also that "the plaintiff incurred damages as a result." *S&G Invests., L.L.C. v. United Cos., L.L.C.*, 12th Dist. Clermont No. CA2010-03-017, 2010-Ohio-3691, ¶ 12. Tucker does not dispute that it is bound by and violated the Agreement. The issue is whether TQL presented sufficient evidence to show that it is entitled to monetary relief for the violation.

{¶ 13} "'[T]he sole purpose of contract damages is to compensate the nonbreaching party for losses suffered as a result of a breach[.]'" *DeCastro v. Wellston City School Dist. Bd. of Edn.*, 94 Ohio St.3d 197, 201, 2002-Ohio-478, quoting 3 Restatement of the Law 2d, Contracts, Section 355, at 154 (1981). TQL claims that it suffered a loss of business goodwill. Goodwill is, in essence, "the probability that the old customers will resort to the old place." *Spayd v. Turner, Granzow & Hollenkamp*, 19 Ohio St.3d 55, 60 (1985).[1] A loss of goodwill is a form of lost profits, both of which are recoverable as compensatory damages. *Charles R. Combs Trucking, Inc. v. Internatl. Harvester Co.*, 12 Ohio St.3d 241, 244 (1984); *Homes by Calkins, Inc. v. Fisher*, 92 Ohio App.3d 262, 269 (12th Dist.1993) (referring to damages for lost goodwill as damages for lost profits).

{¶ 14} The general rule for recovery of lost profits, which rule also applies to a claim for loss of goodwill, is that "lost profits may be recovered by the plaintiff in a breach of contract action if: profits were within the contemplation of the parties at the time the contract was made, the loss of profits is the probable result of the breach of contract, and the profits are not remote and speculative and may be shown with reasonable certainty." (Citation

---

1. "The comprehensive definition of 'goodwill' is 'the advantage or benefit, which is acquired by an establishment, beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement, which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices.'" *Spayd v. Turner, Granzow & Hollenkamp*, 19 Ohio St.3d 55, 59-60 (1985), quoting Story, *Commentaries on the Law of Partnership*, Section 99, at 170 (6th Ed.1868).

omitted.) *Combs* at 244. *See also Fisher* at 268-271 (applying this rule to a claim for lost goodwill).

{¶ 15} The loss of goodwill can be established with "testimony by those who have first-hand knowledge of such loss." *Kinetico, Inc. v. Indep. Ohio Nail Co.*, 19 Ohio App.3d 26, 31 (8th Dist.1984). *See also Combs*, 12 Ohio St.3d at 244-245. In *Combs*, it was the testimony of the owner of the company and its secretary-treasurer whose goodwill the plaintiff claimed to have lost, along with testimony from the plaintiff, that established a claim for lost goodwill. *See Combs* at 244-245. The testimony of an outside expert on goodwill was not required. *Kinetico* does not teach otherwise. The *Kinetico* court stated that "[w]here loss of goodwill is not adequately proven by expert testimony," no speculation is allowed as to those damages. *Kinetico* at 31. The court's use of the word "expert" appears to mean one with "first-hand knowledge of such loss," consistent with *Combs*. It was the *Kinetico* plaintiff's vice president who had testified about lost goodwill, and the appellate court never questioned whether he qualified as an expert on this matter.

{¶ 16} TQL argues that the principal evidence establishing lost goodwill is one of its interrogatory answers and the affidavit of one of its employees. In response to an interrogatory asking it to identify damages, TQL stated, "Defendants' actions and false accusations have jeopardized TQL's customer relationships. In addition, TQL is entitled to recover any loss of business because of defendants' conduct as well as recovery of TQL's attorney fees." In her affidavit, TQL's legal-claims specialist Amy Unger explained, "[A] reputation of not paying bills interferes with a broker's ability to get and retain business. False allegations that TQL does not pay the carriers significantly hurts our reputation and dissuades carriers and customers from doing business with TQL. This is especially harmful due to the tight market within the highly competitive freight brokerage industry." According to Unger, "Tucker and Reed's actions are extremely harmful to TQL's ongoing relationships

with its customers and carriers. As such, TQL's reputation has been damaged." In fact, said Unger, "[d]ue to Tucker and Reed's actions, TQL's customer threatened to stop doing business with TQL." We note that Unger's email to Reed, quoted earlier, shows how seriously TQL takes actions like Tucker's. Indeed, paragraph 4(b) of the Broker-Carrier Agreement suggests that TQL thinks keeping payment disputes with carriers close to the vest is very important to its business.

{¶ 17} The action that forms the basis of TQL's breach-of-contract claim is Reed's phone call to Prestige demanding payment. This led Prestige to tell TQL's customer Corsi about the demand and to suggest to Corsi that TQL did not pay Daansa. Thus, TQL believes that Reed's single call is responsible for its loss of goodwill. TQL does not request any specific sum for lost goodwill, though. Also, there are only what amount to self-serving declarations in TQL's interrogatory answer and Unger's affidavit that such a loss was sustained at all. Further, while Unger defined loss of goodwill as the loss of reputation, which harms TQL's relationships with customers and carriers, she identified only one customer (presumably Corsi) who had merely "threatened to stop doing business with TQL."

{¶ 18} It is commonsense that having a reputation of not paying bills hurts goodwill and results in lost profits. We recognize that a business's reputation is often lost one allegation at a time. Perhaps one or two or even three allegations do not dissuade carriers or customers, but enough allegations can snowball. It is incredibly difficult, though, to determine how much any one allegation contributes to lost goodwill and ultimately to lost profits. In this case, while it is conceivable that Tucker's actions might have injured TQL's goodwill and might be part of the snowball that leads to lost profits down the road, TQL did not present any evidence that this is so or any evidence suggesting a specific amount for lost goodwill attributable to Tucker's breach. Although an exact calculation is not required at this stage of the litigation, there is no evidence that any amount could even be calculated,

and it would be speculative to assign a dollar amount for TQL's goodwill damages. A party cannot recover damages beyond the amount established with reasonable certainty.

{¶ 19} None of the evidence presented in this case shows that the violation of the Agreement—Reed's call to Prestige—actually had an appreciable negative effect on TQL's reputation or its customer relationships, resulted in the loss of business, or in any way affected TQL's bottom line. Simply put, no reasonable mind could find a loss of goodwill from Reed's one phone call. The vague, unsupported assertions in the evidence are—alone—not enough to find any lost goodwill. At most, the evidence shows that, due to this payment dispute, one customer *threatened* to stop doing business with TQL. Thus there is a lack of evidence that TQL's goodwill was damaged. *See Kinetico*, 19 Ohio App.3d at 31-32 (concluding the same on similar evidence).

{¶ 20} In sum, TQL failed to show the existence of—not simply the calculation of—actual damage to its goodwill resulting from Tucker's violation of the Agreement. Thus, the trial court properly found that Tucker failed to present sufficient evidence that it suffered goodwill damages.

{¶ 21} However, Tucker unequivocally breached the Broker-Carrier Agreement by seeking payment from Prestige and that breach invaded a significant interest of TQL. Pursuant to paragraph 4(b) of the Broker-Carrier Agreement, TQL seeks to insulate its contracted shippers and their customers from dealing with payment disputes between TQL and its contracted carriers. By doing so, TQL's customers are spared the hassle involved with those disputes, which makes doing business with TQL appealing. TQL is entitled to vindicate its rights in maintaining the integrity of its business model. Tucker's efforts to collect the Daansa account by contacting Prestige frustrated the manner in which TQL conducts business.

{¶ 22} "'An unexcused failure to perform a contract is a legal wrong.'" *DeCastro*, 94

Ohio St.3d at 199, quoting 11 *Williston on Contracts*, Section 1339A (3d Ed.1968). If "a plaintiff proves breach of contract at trial but fails to prove actual damages resulting from that breach, the trial court may enter judgment for the plaintiff and award nominal damages." *Id. See also Lacey v. Laird*, 166 Ohio St. 12 (1956), paragraph two of the syllabus. The nominal damages constitute a penalty or punishment for breaching the contract, that is, "'a small sum fixed without regard to the amount of loss.'" *Id.*, quoting 3 Restatement of the Law 2d, Contracts, Section 346 (1981). This means that despite TQL's failure to prove a loss of goodwill from Tucker's breach, the trial court may still enter judgment for TQL and award it nominal damages.

{¶ 23} The Ohio Supreme Court has held that if only nominal damages are available, an appellate court may reverse and remand only if "a significant right is involved, including inequitable assessment of costs." *Id.* at 200. Here, there are significant rights involved: recovery of attorney fees and costs. The complaint seeks attorney fees and costs associated with bringing this lawsuit. It appears that TQL may be contractually entitled to these amounts under paragraph 15 of the Broker-Carrier Agreement, which pertinently states: "The prevailing party in any lawsuit between the Parties shall be entitled to all reasonable expenses, attorney fees, and costs (including court costs)."

{¶ 24} "Prevailing party" is not defined in the Agreement. "A prevailing party is generally the party in whose favor the decision, verdict, or judgment [is] rendered." (Citation omitted.) *Windward Ents., Inc. v. Valley City Dev. Group L.L.C.*, 9th Dist. Medina No. 18CA0001-M, 2019-Ohio-3419, ¶ 34; *Marafiote v. Estate of Marafiote*, 7th Dist. Mahoning No. 14 MA 0130, 2016-Ohio-4809, ¶ 13. This includes "'[t]he party to a suit who successfully prosecutes the action * * *, *prevailing on the main issue*, even though not necessarily to the extent of his original contention.'" (Emphasis sic.) *Id.*, quoting *Moga v. Crawford*, 9th Dist. Summit No. 23965, 2008-Ohio-2155, ¶ 6. Here, despite not being able to show a loss of

goodwill, TQL is entitled to recover nominal damages on its breach-of-contract claim. An award of nominal damages may serve to confer prevailing party status upon TQL, entitling it an award of attorney fees and costs pursuant to the Agreement.

{¶ 25} In sum, we conclude that TQL is entitled to nominal damages for Tucker's violation of the Agreement and, subject to a determination of whether TQL is the prevailing party in the litigation, an award of reasonable expenses, attorney fees, and costs under the Agreement. We therefore remand this case to the trial court for an assessment of nominal damages and a prevailing party determination.

{¶ 26} The trial court also granted Tucker summary judgment on TQL's request for a permanent injunction "prohibiting the Defendants, or their agents, from contacting or suing any TQL customers, or TQL's customers' customers, demanding payment for invoices allegedly owed to trucking companies."

{¶ 27} "It is well-established that in order to obtain an injunction, the moving party must show by clear and convincing evidence that immediate and irreparable injury, loss or damage will result to the applicant and that no adequate remedy at law exists. Actual irreparable harm usually may not be presumed but must be proved." (Citation omitted.) *Middletown v. Butler Cty. Bd. of Cty. Commrs.*, 12th Dist. Butler No. CA94-03-084, 1995 WL 55320, *2 (Feb. 13, 1995). Injunctive relief may also be available "to the extent that irreparable harm is actually threatened." *Id.* Irreparable injury or harm has been defined as "an injury 'for the redress of which, after its occurrence, there could be no plain, adequate and complete remedy at law, and for which restitution in specie (money) would be impossible, difficult or incomplete.'" (Citations omitted.) *Connor Group v. Raney*, 2d Dist. Montgomery No. 26653, 2016-Ohio-2959, ¶ 21.

{¶ 28} "The grant or denial of a motion for injunctive relief is solely within the trial court's discretion." *Southwestern Ohio Basketball, Inc. v. Himes*, 12th Dist. Warren No.

CA2020-08- 045, 2021-Ohio-415, ¶ 34.  It follows that "[i]t is within the trial court's discretion to make a reasonable determination whether an adequate remedy at law is available or whether irreparable injury will result to the party seeking an injunction if no injunction is issued."  *Connor Group* at ¶ 21.  We review a decision on injunctive relief for abuse of discretion.  *See Deerfield Twp., Warren Cty. v. Loveland Park Baptist Church*, 12th Dist. Warren No. CA2000-07-064, 2001 WL 290270, *2 (Mar. 26, 2001).

{¶ 29} TQL argues that injunctive relief is needed to prevent imminent and irreparable harm to its goodwill and reputation.  Although Reed made only a single telephone call, TQL states that Tucker has indicated it would continue making collection calls, pointing out that Tucker has never said it would cease collection efforts.  TQL speculates that other trucking companies could assign their accounts receivable to Tucker. TQL also cites Reed's statement that "calling 3rd parties * * * is part of the process" and asserts that this shows Tucker will continue seeking to collect TQL accounts from others because that is how it does business.

{¶ 30}  The trial court was not persuaded, concluding that there was no genuine issue of fact as to whether TQL faced imminent and irreparable harm.  The court found little evidence that Tucker would continue violating the Agreement in its efforts to collect the Daansa account, reiterating its determination that there was no evidence that TQL had suffered any harm.

{¶ 31} We find that the trial court's decision is eminently reasonable. The evidence does not show that TQL faces immediate and irreparable injury or harm.  Nothing shows that Tucker has actually threatened TQL with continued harm.  TQL identified its interests (i.e., goodwill and reputation) but offered nothing beyond mere speculation that an injunction is necessary to prevent Tucker from continuing to injure these interests. Moreover, there is no evidence that other trucking companies have assigned their accounts

receivable with TQL to Tucker or that Tucker will persist in contacting Prestige, Corsi, or anyone other than TQL to collect on Daansa's—or any other—account. Although we do not hold that a single act may never serve as the basis for injunctive relief, under the circumstances of this case the trial court did not abuse its discretion by denying TQL's request for a permanent injunction.

{¶ 32} The first assignment of error is sustained in part and overruled in part.

{¶ 33} Assignment of Error No. 2:

{¶ 34} THE TRIAL COURT ERRED WHEN IT DISMISSED COUNT 2 OF PLAINTIFF'S AMENDED COMPLAINT, WHICH MADE CLAIMS FOR TORTIOUS INTERFERENCE WITH CONTRACT AND TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP.

{¶ 35} The trial court dismissed TQL's tortious interference claim under Civ.R. 12(B)(6); TQL contends that it should not have done so. We review the trial court's decision de novo. *A N Bros. Corp. v. Total Quality Logistics, L.L.C.*, 12th Dist. Clermont No. CA2015-02-021, 2016-Ohio-549, ¶ 18.

{¶ 36} A Civ.R. 12(B)(6) motion for failure to state a claim asks a court to determine if the allegations in a complaint set forth an actionable claim. *Pyle v. Ledex, Inc.*, 49 Ohio App.3d 139, 143 (12th Dist.1988). A court may look only to the complaint to determine whether the allegations are legally sufficient to state a claim. *Ward v. Graue*, 12th Dist. Clermont No. CA2011-04-032, 2012-Ohio-760, ¶ 10. The court must presume that all factual allegations in the complaint are true and must make all reasonable inferences in favor of the nonmoving party. *Mitchell v. Lawson Milk Co.*, 40 Ohio St.3d 190, 192 (1988). The court should dismiss the claim if it appears beyond a reasonable doubt from the complaint that the plaintiff can prove no set of facts entitling it to relief. *LeRoy v. Allen, Yurasek & Merklin*, 114 Ohio St.3d 323, 2007-Ohio-3608, ¶ 14.

{¶ 37} "The torts of interference with business relationships and contract rights generally occur when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 14, 1995-Ohio-66. "The elements essential to recovery for a tortious interference with a business relationship are: (1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom." *Ginn v. Stonecreek Dental Care*, 12th Dist. Fayette No. CA2014-06-015, 2015-Ohio-1600, ¶ 11. The elements of tortious interference with contract are "'(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages.'" *Id.* at ¶ 12, quoting *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171, 176, 1999-Ohio-260.

{¶ 38} TQL's claim for tortious interference with contract and/or business states facts concerning Tucker's collection call to Prestige. The claim pertinently alleges that "Tucker and Reed's actions in demanding payment from customers and parties other than TQL amounts [sic] to a tortious interference with TQL's contracts and/or business relationships with these customers and third parties." As an initial matter, we note that the allegation that Tucker's actions "amount[] to a tortious interference" is a legal conclusion, not a statement of fact. But more importantly, tortious interference requires at least two people who have a (prospective) business relationship or a contract plus one other person who interferes with that relationship or gets one of the first two to breach their contract. *A & B-Abell* at 14 ("purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another"). TQL's only business relationship identified in the complaint is that with Corsi. It is not alleged that Tucker's actions caused

Corsi—or any other potential or existing customer—not to continue or enter a business relationship with TQL. The only contract mentioned is the Broker-Carrier Agreement binding TQL, Daansa, and Tucker. The complaint does not allege that Tucker caused Daansa to violate the Agreement. The breach of contract in this case plainly was not a third-party breach caused by Tucker's tortious interference but Tucker's own first-party breach.

{¶ 39} The trial court properly dismissed TQL's claim for tortious interference. The complaint does not allege that Tucker induced or otherwise purposely caused a third person not to enter or to continue a business relation or not to perform a contract with TQL. Therefore TQL cannot be granted relief on this claim.

{¶ 40} The second assignment of error is overruled.

{¶ 41} We have sustained the first assignment of error in part and overruled it in part. Accordingly, the trial court's May 21, 2021 judgment granting summary judgment is reversed regarding the claim for monetary relief and affirmed regarding the denial of injunctive relief. We have overruled the second assignment of error in full. So the court's May 22, 2020 judgment granting dismissal of the tortious interference claim is affirmed. This case is remanded for further proceedings consistent with this Opinion.

{¶ 42} May 21, 2021 judgment entering summary judgment is affirmed in part and reversed in part.

{¶ 43} May 22, 2020 judgment dismissing claims is affirmed.

S. POWELL and BYRNE, JJ., concur.