[Cite as *S.E. v. Edelstein*, 2024-Ohio-1090.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| S.E., a minor, et al., | : | |
| Appellants, | : | CASE NO. CA2023-08-064 |
| | : | O P I N I O N |
| - vs - | | 3/25/2024 |
| | : | |
| MAX EDELSTEIN, | : | |
| Appellant. | : | |

CIVIL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 23CV96112

Kimberly A. Edelstein, pro se, and for appellant, S.E., a minor.

Max Edelstein, pro se.


**S. POWELL, P.J.**

{¶ 1} Appellants, S.E., a minor, and S.E.'s mother, Kimberly Edelstein, both individually and in her representative capacity as the mother of S.E., appeal the decision of the Warren County Court of Common Pleas granting the pro se motion to dismiss filed by appellee, Max Edelstein, S.E.'s grandfather and the father of Kimberly's ex-husband, defendant, Eliott Edelstein. For the reasons outlined below, we affirm the trial court's

decision.

**Facts and Procedural History**

{¶ 2} Kimberly and her ex-husband Eliott are the biological parents of the minor, S.E., a boy. The record indicates that at the time of their marriage, both Kimberly and Eliott were practicing Orthodox Jews. So too was Max. The record indicates that Kimberly and S.E. are still Sabbath-observant, Orthodox Jews who, according to Kimberly, adhere to all Jewish laws. The record indicates that Max is still Jewish, as well. The record is silent as it relates to Eliott.

{¶ 3} On August 2, 2022, Eliott filed for divorce from Kimberly in Hamilton County, Ohio. This was three days after Eliott filed for and received a domestic violence civil protection order against Kimberly from the Hamilton County Court of Common Pleas, Domestic Relations Division, on July 29, 2022. The First District Court of Appeals later upheld the issuance of that domestic violence civil protection order to Eliott on appeal in *Edelstein v. Edelstein*, 1st Dist. Hamilton No. C-220626, 2023-Ohio-2503.[1]

{¶ 4} On June 8, 2023, Kimberly, an attorney in good standing licensed to practice law in Ohio, filed a complaint, on behalf of both her and her minor son, S.E., naming Max, Eliott, and a third party, Angela Wafford, as defendants.[2] The complaint referred to Angela as a "friend and co-worker" of Eliott, who the complaint alleged "overtly flirted and made sexual advances towards" Eliott, while at the same time Angela

---

1. The First District affirmed the issuance of that domestic violence civil protection order to Eliott upon finding Kimberly had engaged in a pattern of behavior targeting Eliott that met the statutory elements of menacing by stalking in violation of R.C. 2903.211. *Edelstein v. Edelstein*, 1st Dist. Hamilton No. C-220626, 2023-Ohio-2503, ¶ 23. As noted by the First District, this included Kimberly "surveilling Eliott in the private break room at his work, surveilling his car at work, following him to his rabbi's house, sending unwanted text messages to Eliott, threatening to harm Eliott and have him killed, possessing a gun, and placing a tracking device on Eliott's car that was disguised as being from an insurance company." *Id.*

2. Due to privacy concerns, this court has renamed the third defendant to "Amanda Wafford" for purposes of issuing this opinion.

"systematically maligned" Kimberly to Eliott.

{¶ 5} The complaint contained a total of 18 causes of action against the three above-named defendants.[3] Of those 18 causes of action, however, there were only five causes of action that were brought against Max. Those five causes of action were set forth in Counts 14 through 18 of the complaint. The five causes of action against Max alleged: (1) intentional interference with a contractual relationship (Count 14); (2) loss of consortium (Count 15); (3) loss of parental consortium (Count 16); (4) intentional infliction of emotional distress (Count 17); and (5) malice (Count 18).

{¶ 6} As set forth in the complaint, the five causes of action brought against Max were based on Max's alleged "disproval of the contractual relationship" between Kimberly and Max's son, Eliott, which resulted in Max purportedly lying about, slandering, and maligning Kimberly to Eliott and others, "in an attempt to destroy the contractual relationship." The purported contractual relationship that Max was alleged to have interfered with was entered into by Kimberly and Eliott on May 19, 2002 through their joint execution of a ketubah.[4]

{¶ 7} A ketubah is a traditional Jewish marriage contract. The ketubah at issue in this case—as translated from its original Hebrew—initially states:

> On the first day of the week, the eighth day of the month of Sivan, in the 5762nd year of the world's creation, following the reckoning by which we count here in Albany, New York, in North America, we saw how the groom, [Eliott] son of [Max]

---

3. This filing was, in fact, an amended complaint, Kimberly having filed her original complaint with the trial court on May 10, 2023.

4. The complaint referred to this document as a "ketubbah" rather than "ketubah." However, based on this court's review of cases from across the country, there is only one case that uses the spelling "ketubbah," whereas the others use the spelling "ketubah." *Compare Burns v. Burns*, 223 N.J. Super. 219, 222 (1987) ("[s]ince [both the plaintiff and the defendant] were of the Jewish religion they felt compelled to secure 'gets' from their prior spouses in order to properly enter into a Jewish contract of marriage known as a 'ketubbah'"); *with S.F. v. J.S.*, 80 Misc.3d 1218(A) (2023) ("The parties' Ketubah [a traditional Jewish marriage contract] was signed by Rabbi X and then two [2] witnesses, M.H. and E.P., both close friends of Defendant").

said to [Kimberly]: "Be my wife according to the legal custom of Moses and Israel, and I will cherish you, honor you, and provide you food and livelihood as is the law for Jewish men who cherish, honor, and provide food and livelihood to their wives in good faith. I am giving to you 100 silver *zuzim* as is due you as well as food, clothing, and necessities and will live with you as husband and wife as is the way of all the world."[5]

{¶ 8} The ketubah continues by stating:

And [Kimberly] agreed and became his wife. Her dowry which she brought from her own, whether silver, gold, jewelry, clothing, furniture, or bed-clothes—all of it, our groom [Eliott] has accepted for 50 silver pieces and our groom [Eliott] has consented on his own to add on another 50 silver pieces for a total of 100 silver pieces. And thus said our groom [Eliott]: "The responsibility of this marriage contract and this addition I have accepted upon myself and my heirs after my life from this day and forever, that it may be paid from the best part of my property and possessions that are under the whole of heaven, both that which I now possess and that which I may acquire in the future, both real property and chattels. All these shall be mortgaged so that this wedding contract, dowry, and addition may be collected from them, even from the cloak I wear on my shoulders, in my life and after it, from this day forth and forever."

{¶ 9} Concluding, the ketubah states:

Our groom [Eliott] has taken upon himself the responsibilities and the strict requirements of this marriage contract, dowry arrangement, and addition as is customary and practiced with Jewish women as enacted in the ordinances of our Sages of blessed memory, and it is not an uncompensated forfeiture or a mere boilerplate document. All that has been clearly set out above has been finalized by a legal act of formal delivery and acquisition from our groom [Eliott] son of [Max] to this righteous convert [Kimberly] daughter of our Father Abraham using a garment legally fit for that purpose and all is valid and confirmed.

{¶ 10} Given its terms, the ketubah at issue in this case required Eliott and,

---

5. A "zuzim" is the plural form of "zuz," referring to an ancient Jewish currency. A single "zuz" is the equivalent to approximately 3.5 grams of pure silver. This necessarily means the "100 silver zuzim" referred to in the ketubah would be equivalent to .77 pounds of pure silver, which, at the time this opinion was written, had a value of approximately $260.

following Eliott's passing, his heirs, to "cherish" and "honor" Kimberly. The ketubah also required Eliott to provide Kimberly with "food," "clothing," "necessities," and a "livelihood," and to "live" with Kimberly as husband and wife, so long as Kimberly agreed to and thereafter did marry Eliott, "as is the way of all the world." The ketubah's terms indicate that Eliott was required to provide Kimberly with these things—most notably "food," "clothing," "necessities," and a "livelihood"—unconditionally for the rest of her life regardless of whether Eliott and Kimberly later divorced or if Kimberly succeeded Eliott in death.

{¶ 11} In the complaint, it was alleged that Max had intentionally interfered with the ketubah, the supposed "contract" at issue in this case, by engaging in a continuous "campaign to undermine" Kimberly and Eliott's contractual relationship (i.e., their marriage) for nearly 20 years. The complaint alleged that this included Max being "emotionally abusive" towards Kimberly, as well as Max making "negative and derogatory statements" about Kimberly. This, according to the complaint, included Max criticizing Kimberly's "status as a convert to Judaism" and by frequently stating that Kimberly's and Eliott's children "were not Jewish." The complaint also alleged that Max, "with the intent to destroy the contractual relationship between" Kimberly and Eliott, routinely disparaged Kimberly to "persuade" Eliott to "terminate his contractual relationship with [her]."

{¶ 12} The complaint further alleged that after Eliott breached the supposed "contract" on April 21, 2022, presumably by initiating his and Kimberly's separation, Max "discouraged" Eliott from "correcting" his breach and instead "encouraged" Eliott to "abandon" his family.[6] The complaint alleged that Max's actions ultimately resulted in

---

6. The complaint does not state with any particularity how Eliott supposedly breached the purported "contract" with Kimberly on April 21, 2022. The complaint merely states that Eliott's breach of that "contract" caused "significant and long-term damage and severe emotional distress" to both Kimberly and S.E.

Kimberly losing out on the life she was to have with Eliott, as well as in their minor son, S.E., not having his father there to provide him with "daily attention and affection," all of which, according to the complaint, resulted in Kimberly and S.E. incurring actual, compensatory, and punitive damages in an amount totaling nearly $1,000,000. This includes $930,000 in damages to Kimberly to compensate her for "the average cost of living" for the next 31 years, the total number of years the complaint alleges Kimberly would be expected to live based upon the "Actuarial Life Table" developed by United States Social Security Administration."[7]

{¶ 13} On July 7, 2023, Max filed a pro se motion to dismiss. To support his motion, Max alleged that the complaint's five causes of action brought against him should be dismissed due the trial court's lack of jurisdiction over his person, as well as the trial court's lack of jurisdiction over the subject matter of the case. Although not explicitly citing to the rule, Max also alleged that those five causes of action should be dismissed because they "fail[ed] to state a cause of action against [him] upon which relief may be granted" pursuant to Civ.R. 12(B)(6). Three days later, on July 10, 2023, Kimberly filed her and her minor son S.E.'s response in opposition to Max's motion to dismiss.

{¶ 14} On July 26, 2023, the trial court issued a decision granting Max's motion to dismiss. In so doing, the trial court determined that, although the court did have jurisdiction over Max's person, and while the court did have jurisdiction over the subject matter of the case, each of the complaint's five causes of action brought against Max failed to state a claim upon which either Kimberly or S.E. were entitled to relief, thereby necessitating those five causes action being dismissed.

{¶ 15} More specifically, as it relates to the complaint's intentional interference with

___

7. The Actuarial Life Table developed by the United States Social Security Administration can be found online at https://www.ssa.gov/oact/STATS/table4c6.html (last accessed Mar. 4, 2024).

a contractual relationship claim brought against Max in Count 14, the trial court stated:

> The contract at issue between [Eliott] and [Kimberly] is not an ante-nuptial or a property separation agreement. This is a marital agreement as it relates to the parties' conduct during the marriage. * * * [Kimberly] avers that Max has intentionally interfered with this contract. Pursuant to R.C. 2305.29, [neither] Max, nor any other person, can be held liable in civil damages for any breach of promise to marry or alienation of affection and [Kimberly's and S.E.'s] attempts to categorize this amatory tort as an interference with a contract fails.

{¶ 16} Next, as it relates to the complaint's loss of spousal and parental consortium claims brought against Max in Counts 15 and 16, the trial court determined that the complaint "did not allege any bodily injury, or physical harm to either [Kimberly] or S.E., and therefore a loss of consortium claim cannot stand." Furthermore, as it relates to the complaint's intentional infliction of emotional distress claim brought against Max in Count 17, the trial court stated:

> Here, [Kimberly] avers that Max's intentional interference with a contractual relationship resulted in the traumatic abandonment by [Eliott] of his son, S.E. * * * [Kimberly] avers that Max's conduct was extreme and outrageous as he actively attempted to break up the marriage between [Kimberly] and [Eliott]. Stated another way, Max did not approve of who his son was marrying and voiced his opinion of said disapproval. Taking all the allegations as true, and construing any inference in favor of [Kimberly and S.E.], the Court finds that [Kimberly and S.E.] have failed to state a claim upon which relief can be granted.

The trial court instead determined that, "the tort of alienation of affection," which was abolished by the General Assembly through the enactment of R.C. 2305.29, was "not revived by the recognition of the independent tort of intentional infliction of emotional distress."

{¶ 17} Finally, as it relates to the complaint's malice claim brought against Max in Count 18, the trial court determined that "[t]his cause of action is identical to a punitive damage cause of action." The trial court therefore concluded by stating that, "[s]ince the

remaining causes of action have been dismissed against [Max], the claim for malice cannot stand on its own. Therefore, it is also dismissed."

{¶ 18} On August 7, 2023, Kimberly and S.E. moved the court to reconsider its decision to grant Max's motion to dismiss. However, the very next day, on August 8, 2023, the trial court issued an entry and order denying Kimberly and S.E.'s motion for reconsideration. In so doing, the trial court found Kimberly and S.E.'s motion was nothing more than "an attempt to get a second bite of the proverbial apple." The trial court further noted that, in addition to Kimberly and S.E. not arguing that there was an obvious error anywhere within the trial court's decision, Kimberly and S.E. also did not "raise any issue for the Court's consideration that was either not at all or was not fully considered."

**S.E. and Kimberly's Appeal and Three Assignments of Error**

{¶ 19} On August 21, 2023, Kimberly and S.E. filed a notice of appeal from the trial court's decision granting Max's motion to dismiss. The appeal now properly before this court for decision, Kimberly and S.E. have raised three assignments of error for review.[8] In each of those three assignments of error, Kimberly and S.E. argue the trial court erred by granting Max's motion to dismiss. We disagree.

*Civ.R. 12(B)(6) Motion to Dismiss Standard of Review*

{¶ 20} The trial court granted Max's motion to dismiss pursuant to Civ.R. 12(B)(6). "Civ.R. 12(B)(6) authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted." *Rossi v. Atrium Med. Ctr.*, 12th Dist. Warren No. CA2022-05-027, 2023-Ohio-984, ¶ 8, citing *Marchetti v. Blankenburg*, 12th Dist. Butler No.

---

8. We note that Max did not file an appellee brief in this case. However, in response to this court's show cause order, Max noted that he rejected each of the complaint's five causes of action brought against him "as being without any factual or legal merit, and in response thereto," he would be relying "upon the trial court's factual findings and legal conclusions" as referenced in the trial court's July 26, 2023 decision granting his pro se motion to dismiss pursuant to Civ.R. 12(B)(6) and the trial court's August 8, 2023 entry and order denying Kimberly's and S.E.'s motion for reconsideration.

CA2010-09-232, 2011-Ohio-2212, ¶ 9. "A motion to dismiss for failure to state a claim upon which relief can be granted tests the sufficiency of the complaint." *Volbers-Klarich v. Middletown Mgt., Inc.*, 125 Ohio St.3d 494, 2010-Ohio-2057, ¶ 11. To that end, "[a] Civ.R. 12(B)(6) motion for failure to state a claim asks a court to determine if the allegations in a complaint set forth an actionable claim." *Total Quality Logistics, L.L.C. v. Tucker, Albin & Assocs.*, 12th Dist. CA2021-06-031, 2022-Ohio-1802, ¶ 36, citing *Pyle v. Ledex, Inc.*, 49 Ohio App.3d 139, 143 (12th Dist.1988).

{¶ 21} "In ruling on a complaint under Civ.R. 12(B)(6), the trial court must presume that all factual allegations in the complaint are true and draw all reasonable inferences in favor of the nonmoving party." *Fontain v. H&R Cincy Properties, L.L.C.*, 12th Dist. Warren No. CA2021-02-015, 2022-Ohio-1000, ¶ 55, citing *Mitchell v. Lawson Milk Co.*, 40 Ohio St.3d 190, 192 (1988). This necessarily means that, "as long as there is a set of facts, consistent with the plaintiff's complaint, which would allow the plaintiff to recover, the [trial] court may not grant a defendant's motion to dismiss." *Conaway v. Mt. Orab*, 12th Dist. Brown No. CA2021-04-005, 2021-Ohio-4041, ¶ 13, citing *York v. Ohio State Highway Patrol*, 60 Ohio St.3d 143, 145 (1991).

{¶ 22} "A trial court's order granting a motion to dismiss pursuant to Civ.R. 12(B)(6) is subject to de novo review on appeal." *BAC Home Loans Servicing, L.P. v. Kolenich*, 194 Ohio App.3d 777, 2011-Ohio-3345, ¶ 35 (12th Dist.). "This court therefore must independently review the complaint to determine the appropriateness of the trial court's dismissal." *Dudley v. Siler Excavation Servs., LLC*, 12th Dist. Clermont No. CA2022-06-030, 2023-Ohio-666, ¶ 10.

*Arguments and Analysis*

{¶ 23} To support their three assignments of error, Kimberly and S.E. raise a variety of interesting arguments for this court's consideration. This includes an argument

wherein Kimberly and S.E. allege the trial court failed to apply the appropriate Civ.R. 12(B)(6) standard when reviewing Max's pro se motion. This also includes Kimberly and S.E.'s argument that the ketubah at issue was in actuality not, as the trial court had determined within its decision, a "promise to marry." Rather, just as they argued below to the trial court, Kimberly and S.E. instead argue the ketubah was a standard, binding "legal contract" that could easily be enforced by the trial court just like any other prenuptial or antenuptial agreement without concern for the First Amendment's free exercise and establishment clauses under the "neutral contract principles" articulated by the United States Supreme Court in *Jones v. Wolf*, 443 U.S. 595, 99 S.Ct. 3020 (1979).[9] This is in addition to Kimberly and S.E.'s argument that the trial court "misapplied" the law when determining that enforcing the ketubah's terms in this case would be against public policy in Ohio.

**{¶ 24}** However, after a thorough review of the record, and upon extensive legal research from sources all throughout the country regarding the enforceability of a ketubah, we find no error in the trial court's decision to grant Max's pro se Civ.R. 12(B)(6) motion to dismiss. We instead agree with the trial court's finding that, pursuant to R.C. 2305.29, neither Max, nor any other person, could be held liable in civil damages to either Kimberly or S.E. for any breach of a promise to marry or alienation of affection as was alleged in Counts 14 through 18 of the complaint. *See Benkovits v. Bandi*, 8th Dist. Cuyahoga No. 109533, 2021-Ohio-1877, ¶ 22 (noting that a claim alleging tortious interference with a marital contract is an amatory action that has been abolished in Ohio

---

9. "The neutral principle of law approach prevents mahr agreements, and other private, religious marriage agreements, from being denied simply because they came about in a religious context allowing them to be enforced based solely on their ability to comply with the 'objective, well-established,' secular laws." *Khan v. Hasan*, 73 Misc.3d 422, 428, 153 N.Y.S.3d (2021). A "mahr is money paid to the bride by the groom or his family for the financial protection of the bride in the case of divorce." *Mir v. Birjandi*, 2d Dist. Greene Nos. 2006 CA 63, 2006 CA 71, and 2006 CA 72, 2007-Ohio-6266, ¶ 40.

pursuant to R.C. 2305.09).

{¶ 25} In so holding, we note our agreement with the trial court's finding Kimberly and S.E.'s attempts to disguise their amatory claims alleging a breach of a promise to marry and alienation of affections against Max in terms of an intentional interference with a contractual relationship (Count 14), loss of spousal consortium (Count 15), loss of parental consortium (Count 16), intentional infliction of emotional distress (Count 17), and malice (Count 18) must fail as a matter of law. To hold otherwise would be directly contrary to the plain language set forth in R.C. 2305.29 abolishing such claims.

{¶ 26} In reaching this decision, we note that nowhere within Kimberly and S.E.'s appellate brief do they argue the trial court erred by dismissing the complaint's claims against Max alleging a loss of spousal consortium (Count 15) and loss of parental consortium (Count 16) due to the complaint's failure to "allege any bodily injury, or physical harm" having occurred in this case. This includes no allegations of bodily injury or physical harm as it related to Kimberly or Eliott, as well as to their minor son, S.E. This is likely because any such argument would have failed for it is well established that, as it relates to a loss of spousal consortium, the claim "is derivative in that the claim is dependent upon the defendant's having committed a legally cognizable tort upon the spouse who suffers bodily injury." *Bowen v. Kil-Kare, Inc.*, 63 Ohio St.3d 84, 93 (1992).

{¶ 27} Thus, "a claim for loss of [spousal] consortium is dependent upon bodily injury to the spouse." *Morgan v. Enterprise Rent-A-Car*, 11th Dist. Trumbull No. 98-T-0103, 2000 Ohio App. LEXIS 1431, *15 (Mar. 31, 2000). The term "bodily injury," in so far as it is used in this context, does not include non-physical harms such as emotional distress. *Blatnik v. Avery Dennison Corp.*, 148 Ohio App.3d 494, 2002-Ohio-1682, ¶ 95 (11th Dist.). To establish a loss of spousal consortium claim, however, it is not only the spouse who must be injured. Rather, because a loss of spousal consortium claim is

legally separate and independent from the claim of the injured spouse, "the spouse claiming loss of consortium must [also] provide evidence of his or her own injury beyond [that of] his or her spouse's injury." *Long v. Harding*, 12th Dist. Butler No. CA2020-11-120, 2021-Ohio-4240, ¶ 49, citing *Richard v. Wal-Mart Discount Stores*, 2d Dist. Miami No. 98 CA 48, 1999 Ohio App. LEXIS 4781, *20 (Oct. 8, 1999). The complaint simply did not do that in this case. *See Weaver v. Deevers*, 11th Dist. Portage No. 2020-P-0087, 2021-Ohio-3791 ¶ 20 ("because appellants did not allege bodily injury, or physical harm, to either [of the two plaintiff/appellant wives], defendants were entitled to summary judgment in their favor on the loss of [spousal] consortium claims").

{¶ 28} The same would hold true as it relates to a child's loss of parental consortium claim, regardless of whether that child was a minor child or an emancipated adult child. *See generally Brady v. Miller*, 2d Dist. Montgomery No. 19723, 2003-Ohio-4582, ¶ 14 (noting that "[i]n recent years, Ohio law has evolved significantly as it pertains to loss-of consortium claims brought by parents and their children" to include "a minor child's cause of action for loss of parental consortium, and a parent's cause of action for loss of filial consortium involving injury to a minor child," as well as "emancipated adult children * * * for loss of parental consortium"). That is to say, in addition to the bodily injury suffered by the child's parent, the child claiming a loss of parental consortium must also provide evidence of his or her own injury, thereby allowing the child to be "compensated for a harm done or for losses suffered as a result of injury to the parent and to the parent-child relationship." *Rolf v. Tri State Motor Transit Co.*, 91 Ohio St.3d 380, 382 (2001). Again, the complaint simply did not do that in this case.

{¶ 29} We also note our disagreement with Kimberly and S.E.'s claim set forth within their appellate brief wherein they allege that states with larger Jewish populations, such as New Jersey, New York, and Connecticut, have all determined that ketubahs like

the one at issue in this case are, without exception, "valid prenuptial agreements."  In so doing, we find it necessary to discuss the recent decision issued by the Supreme Court of Connecticut in *Tilsen v. Benson*, 347 Conn. 758 (2023).  In that case, the Connecticut Supreme Court affirmed a trial court's decision *denying* a husband's motion to enforce certain terms of the ketubah that he and his ex-wife executed prior to their marriage as a valid prenuptial agreement.  Specifically, the portion of the ketubah that stated, "the parties 'agreed to divorce [or, separate from] one another according to custom all the days of their life [i.e., as a continuing obligation] according to Torah law as is the manner of Jewish people.'"  *Id.* at 767.

{¶ 30}  Like Kimberly and S.E. in the case at bar, the husband in *Tilsen* argued that: (1) the enforcement of the ketubah would not violate the First Amendment's establishment clause; and (2) failing to enforce the ketubah would violate his rights under the First Amendment's free exercise clause.  However, upon review, the Connecticut Supreme Court disagreed with both of husband's claims and affirmed the lower court's decision overruling husband's motion.  In so holding, the Supreme Court of Connecticut initially concluded as it relates to husband's claims under the First Amendment's establishment clause:

> [T]he plaintiff's desired relief violates the establishment clause under the neutral principles of law doctrine.  Most significant, the parties' ketubah is facially silent as to each spouse's support obligations in the event of dissolution of the marriage, thus leaving the court to determine those obligations from external sources as to Jewish law, namely, the parties' expert witnesses, whose proffered opinions differed in this case, instantly alerting the court as to the establishment clause dilemma.  This renders the present case distinct from [*Avitzur v. Avitzur*, 58 N.Y.2d 108 (1983)], in which—under the majority's view of the record—the contested portion of the ketubah was more akin to a typical arbitration clause, insofar as it facially required only the submission of the case to the specific Beth Din and did not require the court to discern and enforce what Jewish law requires with respect to property

- 13 -

division and financial support upon dissolution. * * * Making that determination, especially in the presence of conflicting rabbinical opinions, would render this case a textbook entanglement into religious matters, right to the threshold question of whether those obligations are indeed "religious" in the first instance. * * * We conclude, therefore, that the establishment clause of the first amendment precludes the relief sought by the plaintiff.

*Tilsen*, 347 Conn. at 785-786.

{¶ 31} Next, regarding husband's claim that the trial court's decision not to enforce the ketubah violated his rights under the First Amendment's free exercise clause because it "prevented him from divorcing according to Jewish law, as the parties had agreed," the Connecticut Supreme Court in *Tilsen* concluded that the husband "failed to prove that the trial court's decision not to enforce the ketubah penalized his free exercise rights." *Id.* at 789. In reaching this decision, the Supreme Court of Connecticut first determined that having it make the "determination as to the applicable Jewish law—untenable in any event under the neutral principles of law doctrine—would have risked a violation of the defendant's free exercise rights in the name of protecting those of the plaintiff," particularly "in view of the parties' lack of agreement as to what Jewish law requires in the present case given the breadth of the ketubah's language * * *." *Id.* at 789-790. The Connecticut Supreme Court also determined that:

> Second, the trial court did not deny the plaintiff access to the court or otherwise exact some kind of penalty in connection with his religious beliefs or practices; its decision simply meant that this dissolution action would be governed by generally applicable principles of Connecticut law as expressed in our alimony and equitable distribution statutes. Parties who desire specific tenets of their religious beliefs to govern the resolution of marital dissolution actions remain free to contract for that relief via a properly executed antenuptial, postnuptial, or separation agreement that is specifically worded to express those beliefs in a way that avoids establishment clause concerns under the neutral principles of law doctrine.

*Id.* at 790-791.

- 14 -

**{¶ 32}** The same would certainly apply to Kimberly and Eliott here in Ohio. In other words, rather than through the execution of a vaguely worded ketubah, Kimberly and Eliott could have instead entered a properly executed, and specifically worded, prenuptial, postnuptial, antenuptial, or separation agreement of their choosing based on the well-established, secular laws governing such agreements in Ohio. There is no indication that Kimberly and Eliott ever entered into such an agreement based on the record properly before this court.

**{¶ 33}** We further note the decision issued by the Supreme Court of New York, Tompkins County, in *Cohen v. Cohen*, 2019 N.Y. Misc. LEXIS 1686 (Feb. 7, 2019). In that case, the plaintiff moved to enforce the ketubah she and defendant, her husband, had entered at the time of their marriage. This included the portion of the ketubah that, very similar to the ketubah at issue in this case, stated:

> begins with "[b]e my wife according to the laws of Moses and Israel, and I shall willingly honor, cherish, sustain and support you in the way of the children of Israel, that honor, cherish, sustain and support their wives as fit." It further notes "[a]nd I will give your bride price a hundred Zequqim pure silver and he added one hundred Zequqim pure silver and he added one hundred Zequqim pure silver...". Additionally, added were "one hundred and eighty thousand new Israeli shekels, besides all her clothes, jewelry and belongings which belong to her body". The foregoing is noted as "undertook like all subject contracts and additions that are custom of Jewish girls..."

*Id.* at *7-*8.

**{¶ 34}** The Supreme Court of New York determined, however, that it cannot interpret and give force to what is essentially a religious document imposing religious duties upon the parties." *Id.* at *8. In reaching this decision the New York Supreme Court stated:

> If the matter were to go forward, the Court would be forced to determine whether the Plaintiff faithfully upheld her

- 15 -

obligations as a wife under Jewish law. The Plaintiff's expert asserts in conclusory fashion that such factors are not present. However, in doing so, he recognizes that the Court would be required to reach a conclusion on the issue. Moreover, the Defendant specifically raised as an affirmative defense that Plaintiff failed to uphold her marital obligations, thereby further reinforcing the fact that the Court would be asked to decide these doctrinally related issues. This [is] a question of religious doctrine which the Court is prohibited from evaluating. The Court is unable to assess the claim utilizing purely secular contract principles. The Law of Moses and Halakhah are beyond the Constitutional scope of this Court's jurisdiction.

*Id.*, 2019 N.Y. Misc. LEXIS 1686 at *8-*9. This was in addition to the Supreme Court of New York finding:

even if the Court was not constitutionally prohibited from determining this matter, the ketubah lacks any of the hallmarks of a contractual agreement. * * * There is no promise to pay, or conditions under which payment will be made. Nowhere in the subject ketubah is there reference to divorce as a triggering event for payment of the main ketubah.[10]

*Id.* at *9. We find the same to be true here.

{¶ 35} We additionally note the recent decision issued by the Appellate Court of Illinois, Second District, in *In re Marriage of Katsap*, 2022 IL App. (2d) 210706 (2022). In that case, the petitioner appealed arguing the trial court erred by finding the "property division" portion of the ketubah she and the respondent, her husband, executed prior to their marriage was unenforceable. Specifically, the portion of the ketubah that, in the petitioner's view, required the respondent and his heirs to "pay her $1 million out of any property that [he] now owns or will acquire in the future." *Id.* at 145. The petitioner, just like Kimberly and S.E. in this case, argued that she was entitled to recover under the

---

10. The "main ketubah," as the New York Supreme Court explained, is the amount pledged within the ketubah that is to provide for the future support of the wife in the instance of divorce or the death of the husband. *Cohen v. Cohen*, 2019 N.Y. Misc. LEXIS 1686, *1-*2 (Feb. 7, 2019).

terms of the ketubah because the respondent had "signed the ketubah and agreed, as part of the marriage ceremony, to be bound by it." *Id.* The Illinois Second District Appellate Court disagreed with the petitioner and instead found:

> Here, [petitioner] does not seek to enforce any reasonable terms established, according to expert testimony, as pertaining to Jewish law. Instead, she seeks to enforce a purported promise of [respondent], on behalf of himself and his heirs, to pay her $1 million from all of the property that he may ever own. The court found, and [petitioner] does not dispute, that the entire marital estate is so negligible that it does not have any monetary value. [Respondent's] income from the small business loan proceeds is $4800 per month. [Respondent] testified to his debt, including to his brother, who is paying a portion of [respondent's] child support obligation to [respondent's] ex-wife in Israel. A contract term can be invalidated on grounds of procedural unconscionability, substantive unconscionability, or both. * * * Substantive unconscionability arises where contract terms are inordinately one-sided in one party's favor. * * * [In this case], when the court asked [petitioner's] counsel how the ketubah could be specifically enforced, counsel had no answer. In sum, we agree with [respondent] that the purported agreement for $1 million is unconscionable. Accordingly, we affirm the court's determination that the ketubah is unenforceable.

*Id.* at 149.

{¶ 36} In so ruling, the Illinois Second District Appellate Court noted that its decision was distinguishable from an earlier decision issued by the Appellate Court of Illinois, First District, Fourth Division, in *In re Marriage of Goldman*, 196 Ill.App.3d 785 (1990), wherein a trial court's grant of specific performance of a ketubah's requirement that a husband obtain a "get" for his ex-wife was affirmed. Explaining the differences between the two cases, the Illinois Second District Appellate Court stated that in *Goldman*, unlike in *Katsap*:

> the wife presented expert testimony from two Orthodox Jewish rabbis that the parties' ketubah provided that the husband would obtain a "get," which is a Jewish divorce allowing the wife to remarry and the children born to a second marriage to be recognized as legitimate. * * * The appellate

> court held that the evidence supported that the husband had agreed to obtain a get and that uncontroverted expert testimony established that Orthodox Jewish law requires the husband to obtain and deliver to the wife an Orthodox get upon dissolution of marriage.

*Id.*

{¶ 37} The *Goldman* decision, however, has received some criticism including that by the Connecticut Supreme Court in its *Tilsen* decision discussed above. *See id.*, 347 Conn. at 781-782 (finding more persuasive the dissent in *Goldman* "that it would violate the first amendment to order the husband to provide the wife a get because construction of the vague ketubah language 'required the court to partake in evaluation, investigation and interpretation of religious dogma,' and compelled the husband's 'involvement in an act of religious worship'"); *see also* P. Finkelman, *A Bad Marriage: Jewish Divorce and the First Amendment*, 2 Cardozo Women's L.J. 131, 149-50 (1995) (criticizing *Goldman* because "a secular court [was] trying to determine what is religious law * * * what is the 'law[s] of Moses and Israel,'" which "lead[s] precisely to the kind of entanglement with religion that American courts have historically rejected").

{¶ 38} This appeal, however, does not concern whether the complaint states an actionable claim of specific performance against Max entitling either Kimberly or S.E. to relief. In so far as it relates to Max, it clearly does not. Rather, as noted above, the complaint raises amatory claims of a breach of a promise to marry and alienation of affections against Max couched in terms of an intentional interference with a contractual relationship (Count 14), loss of consortium (Count 15), loss of parental consortium (Count 16), intentional infliction of emotional distress (Count 17), and malice (Count 18). As stated previously, pursuant to R.C. 2305.29, neither Max, nor any other person, could be held liable in civil damages to either Kimberly or S.E. for any breach of a promise to marry or alienation of affection. This holds true despite those claims being pled within the

complaint in other, generally more suitable terms, like intentional interference with a contractual relationship and intentional infliction of emotional distress.

{¶ 39} Just as a rose is a rose by any other name, a non-actionable claim does not become actionable simply by masquerading as one that is. Therefore, finding no error in the trial court's decision to grant Max's pro se Civ.R. 12(B)(6) motion to dismiss each of the five causes of action brought against him within the complaint, and finding no merit to any of the arguments raised by Kimberly and S.E. in their appellate brief, including those arguments not specifically addressed herein, Kimberly and S.E.'s three assignments of error all lack merit and are overruled.

## Conclusion

{¶ 40} For the reasons outlined above, and having now overruled the three assignments of error presented for review, Kimberly and S.E.'s appeal challenging the trial court's decision to grant Max's pro se Civ.R. 12(B)(6) motion to dismiss is denied.

{¶ 41} Judgment affirmed.

M. POWELL and BYRNE, JJ., concur.